Bennie BRYANT, Plaintiff,

v.

TRW, INC., an Ohio Corporation, Defendant.

Civ. No. 78–70896.

United States District Court, E. D. Michigan, S. D.

April 16, 1980.

Forrest Walpole, Walpole & Holmes, Caro, Mich., for plaintiff.

Sidney L. Frank, Frank & Stefani, Troy, Mich., for defendant.

## OPINION

COHN, District Judge.

### I.

Before the Court is defendant's motion for judgment notwithstanding the verdict, or in the alternative, for a new trial seeking to set aside a jury verdict in the amount of $8,000.00 for actual damages for violation of § 607(b) of the Fair Credit Reporting Act (the Act).[1] Plaintiff is a consumer § 603(c); defendant is a consumer reporting agency § 603(f) which issued two consumer reports § 603(d) on plaintiff in May and September of 1976.[2]

Defendant claimed good faith in preparing the two reports and that any mistakes in the reports were caused by the fact that plaintiff's creditors furnished inaccurate information to defendant.

Defendant says that the Court erred as a matter of law in not holding that so long as it accurately reported the information it received from plaintiff's creditors it was free from liability, and that the Court further erred in allowing the jury to consider allegations of willful violation and future damages.

The motion is denied. To accept defendant's position would diminish the jury's role in assessing the performance of consumer reporting agencies under the Act contrary to Congressional intent.

### II.

Plaintiff initially alleged that (1) defendant willfully failed to comply with § 607(b) which requires a consumer reporting agency to follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates," and that defendant willfully failed to comply with § 609(a) which requires certain disclosures upon request of a consumer about the information in a consumer reporting agency's files, (2) that defendant negligently failed to comply with these sections, and (3) that defendant discriminated against plaintiff on account of race.

---

1. P.L. 91–508, 84 Stat. 1127–1136, 15 U.S.C. § 1681, *et seq.* Citations are to sections of the Act.

2. These reports consisted of information obtained from creditors of plaintiff relating generally to his payment history on credit purchases of merchandise. The creditors were subscribers of defendant; that is they had agreements with defendant under which they furnished the information to defendant. A consumer report § 603(d) is different than an investigative consumer report § 603(e) which relates to character and general reputation, etc.

Section 618 confers jurisdiction on this Court to enforce liability under § 616 which makes a consumer reporting agency liable to a consumer for actual damages, punitive damages and attorney fees for willful non-compliance with provisions of the Act, and to enforce liability under § 617 which makes a consumer reporting agency liable to a consumer for actual damages and attorney fees for negligent non-compliance with provisions of the Act.

In general there is a two year statute of limitations § 618.

### III.

Prior to trial the claims under § 609(a) and for racial discrimination were dismissed and the Court declined to exclude evidence of acts or occurrences occurring more than two years prior to the date of suit. The Court also bifurcated defendant's counterclaim for damages alleging conduct on the part of plaintiff intending to harass, embarrass and aggravate, Fed.R.Civ.P. 42.

█ In declining to exclude evidence of acts or occurrences more than two years old, the Court held that such acts or occurrences could be relevant to a determination of whether defendant either negligently or willfully failed to follow reasonable procedures to assure maximum possible accuracy of information. The procedures used by the defendant may or may not involve a method of operation which extends over a period of time. Plaintiff was required to introduce evidence relating to the way defendant operated before he could introduce evidence regarding acts or occurrences as to himself. At trial the Court allowed evidence relating to the history of plaintiff's relationships with defendant going as far back as 1971, but carefully instructed the jury that plaintiff's claims must be judged on the 1976 reports.

Rule 401 of the Federal Rules of Evidence defines relevancy; Rule 402 provides that relevant evidence is admissible; Rule 403 excludes relevant evidence if in the discretion of the Court it determines its prejudicial effect outweighs its probative value. As will be seen from the discussion of the evidence adduced at trial, the only way a jury could reasonably determine whether the defendant followed reasonable procedures to assure maximum possible accuracy of information furnished about plaintiff was to know the history of the relationship between plaintiff and defendant and assess defendant's conduct in the context of that history. The causes of action created by § 616 and § 617 are personal to a consumer and the obligations imposed on a consumer reporting agency are expressed in terms of the particular consumer alleging violation. Without the history of the relationship the jury could not make the judgment required of it under § 616 and § 617.

### IV.

The evidence at trial was relatively straightforward and in sufficient detail to enable the jury to clearly understand the way defendant operated its business and its relationship with plaintiff. In summary the evidence showed:

### A.

Beginning sometime in the early 1970's defendant, one of the largest consumer reporting agencies in Michigan, issued consumer reports on plaintiff. On a number of occasions these consumer reports were inaccurate and on a number of occasions plaintiff discussed in person with representatives of defendant his concerns and also went to his creditors, principally retail merchants, in an endeavor to straighten out information sent to defendant on his accounts.

In May of 1976 defendant issued a consumer report in the form of a mortgage report on plaintiff in connection with a mortgage application on a house purchase. This consumer report contained inaccurate information on plaintiff's account with a retail merchant. Plaintiff went to defendant and called its attention to the inaccuracy. The mortgage loan did not close for unrelated reasons.

In August, 1976 plaintiff again signed a mortgage loan application for a home pur-

chase. On September 7 the mortgage company ordered a consumer report in the form of a mortgage report. On September 28 an employee of defendant called the mortgage company to advise that the mortgage report would contain four items of derogatory information on plaintiff. The mortgage company immediately advised plaintiff. Plaintiff the same day went to defendant's office and discussed in detail the four items. Three of these items did not appear in the May report even though at least one of these items related to events prior to May, 1976 and logically should have been part of the May report. Subsequent to September 28 the creditors involved advised defendant the information they previously furnished was erroneous.

At the September 28 personal meeting between plaintiff and a representative of defendant, a memorandum was placed in plaintiff's file which reads:

> "9–28–76 Cus' wanted us to re-check Ford Mtr Credit.—showed 6 $^{16}$ late charges on most recent clearing (read to mortg. company—file not typed yet). Re-cleared thru adjuster ±FMC.—wanted it shown as pd. acc't.—Gone to Mabel. Told cus. I would review file before it was sent. Also gave him copy of Mgr. attention which is read to creditors. JJW."

The mortgage report was sent to the mortgage company on September 30 in its original form without any further attempt on defendant's part to verify the derogatory items.

The mortgage loan was initially denied on the basis of the mortgage report. Subsequently, with a revision in the mortgage report and through plaintiff's personal efforts the mortgage loan closed.

Plaintiff testified as to the embarrassment, anxiety, humiliation and emotional stress he suffered as a consequence of his difficulties over the two reports. No out-of-pocket expenses or actual dollar losses were proven.

### B.

Defendant's witnesses testified in detail to the procedures it followed in preparing consumer reports and the effort it makes to assure that the information it receives from subscribers is accurately reflected in the consumer reports it issues.

The testimony also showed:

a) defendant did not maintain records showing the relative accuracy of the information furnished by its subscribers;

b) employees of defendant could not say which of its subscribers had the best or worst record for accuracy;

c) no record is kept of the number of times a particular subscriber is the subject of claimed errors;

d) defendant has no uniform definition for the word "delinquency", a term frequently used in its consumer reports but rather it depends on the subscriber's definition, i. e., for one subscriber it could mean ninety days late, for another one day late;

e) defendant does not advise its subscribers that if they are having a dispute with a customer over an account that should be noted in the information it furnishes to defendant.

### C.

There was no claim that the information contained in the two mortgage reports was different than the information furnished by its subscribers. Plaintiff argued to the jury that under the particular circumstances of the history of his relationship with defendant the jury should conclude that defendant failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning plaintiff. Plaintiff pointed to the September 28 personal meeting and the failure of the defendant to re-check the information he furnished them at that time. Plaintiff emphasized the fact that on their face, the May and September mortgage reports were contradictory.[3] All

---

**3.** Plaintiff laid particular emphasis on a comparison between the two reports and called attention to the difference between the information they contained on plaintiff's credit history with Ford Motor Credit Company and the J. L. Hudson Company. This difference could

of this, plaintiff suggested, demonstrated a willfulness on the part of defendant in its actions and caused emotional damage to plaintiff which would extend beyond the date of trial.

### D.

Defendant argued to the jury that plaintiff suffered no out-of-pocket loss; that his failure to purchase the first house was unrelated to anything he did; that he ultimately purchased the second house; that it did everything reasonably possible to accurately transmit the information it received from its subscribers; that it should not be required to have procedures which would have it double-check the accuracy of the information furnished it; and that a reasonable balancing of the creditors' need for relatively prompt information if their customers are to be served, against the complexities of assembling such information, demonstrated that it had maintained reasonable procedures to assure maximum possible accuracy of the information concerning plaintiff.

### E.

In their instructions[4] the jury was advised of the purposes of the Act and was told that the law is directed not at defendant's policies but at the actual procedure it followed in obtaining information and preparing the two mortgage reports on plaintiff. The Court described plaintiff's allegations and told the jury that to find for plaintiff it must find defendant negligently violated the Act, plaintiff was injured and the negligence of defendant was the proximate cause of such injury. The jury was

given a definition of negligence including an admonition that if the reports were accurate in the information they contained defendant could not be found negligent.[5] The jury was further instructed that mental anguish, embarrassment and humiliation are elements of damage measurable both in the past and to the extent that plaintiff was reasonably certain to sustain them in the future and that it was not to speculate or conjecture. The jury was also instructed on willfulness and what it must find to award punitive damages and that it could not award punitive damages if it did not find actual damage. The Court summarized:

> "The Fair Credit Reporting Act required that TRW, Inc., when it prepared a consumer report on Bennie Bryant, follow reasonable procedures to assure maximum possible accuracy of the information concerning Mr. Bryant.
>
> If you find that TRW, Inc. was negligent in following the requirements of the law, you should award Mr. Bryant the actual damages sustained by him because of such negligence.
>
> If you find TRW, Inc. willfully failed to follow the requirements of the law, Mr. Bryant is entitled to his actual damages and you may also award punitive damages.
>
> If you find TRW, Inc. followed reasonable procedures you should find for it."

The verdict form allowed for a dollar finding of actual damages, a dollar finding of punitive damages or a finding in favor of defendant. The jury awarded actual damages of $8,000.00.

---

not be explained he argued because of the four months in time which separated them since the later report contained information antedating the four months. The reasons for the differences were not explained by defendant.

4. While defendant took exceptions to the instructions, nowhere in its motion papers did it indicate which instructions it claimed were erroneous or what instructions it requested that the Court failed to give. Defendant did not order a transcript of the trial proceedings.

5. The instruction on negligence read: "When I use the word 'negligence' in these instructions I mean the failure to do something which a reasonably prudent person would do or the doing of something which a reasonably prudent person would not do under the circumstances which you find existed in this case. It is for you to decide what a reasonably careful person would do or not do under the circumstances. Defendant cannot be found negligent if in fact either of the reports, Exhibits 1 or 2, were accurate in the information they contained."

## V.

■ Before proceeding to a discussion of defendant's claims it should be noted that from the testimony and exhibits adduced at trial it was entirely reasonable for the jury to conclude that defendant's procedures were entirely inadequate to deal with a situation where a consumer who is the subject of a consumer report (1) had a history of difficulty with merchandise creditors reporting accurately on the status of his accounts, (2) that such difficulties were well known to defendant and (3) when such a consumer personally alerted defendant to the fact that items of information in a consumer report it was about to release were inaccurate, defendant was required to do something more than it did here to assure maximum possible accuracy of information concerning such consumer. In other words, the Court is satisfied that the jury could find defendant at least negligent or at worst willful under the testimony. Given the latitude allowed a jury in awarding damages for mental anguish, embarrassment and humiliation and the fact that these are feelings that do not necessarily disappear with a change in circumstances the Court is also satisfied the jury could reasonably find $8,000.00 was the amount necessary to compensate plaintiff for the actual damages suffered by him.

## VI.

Defendant argues:

1) As a matter of law it has no obligation to determine the inherent accuracy of the information it receives from its subscribers and since there is no claim that it failed to transcribe such information accurately it was entitled to a directed verdict. Put another way, it was error to allow the jury to consider whether there is an obligation on defendant to test the truthfulness and/or accuracy of the information it receives.

2) The jury should not have been allowed to consider the claim of willful failure to comply with the requirements of § 607(b).

3) The jury should not have been allowed to consider future damages.

4) The jury should not have been allowed to hear evidence of facts or occurrences occurring more than two years prior to the filing of the complaint. This claim has already been discussed.

5) The damages were excessive and contrary to the great weight of the evidence.

### A.

Neither the Act nor its legislative history offer any clue as to the meaning of the term "willful" as used in § 616. The Court defined it as a voluntary and intentional failure to do something the law requires with a purpose to either disobey or disregard the law. Devitt and Blackmar, *Federal Jury Practice and Instructions* (1977) § 14.06.[6]

■ Plaintiff's visit on September 26 and defendant's failure to follow up with any kind of re-checking certainly warranted allowing the jury to consider whether defendant intentionally disregarded the law, i. e., intentionally failed to follow reasonable procedures under the circumstances.

The Court is satisfied there was a basis in the evidence for the instruction. The jury apparently rejected the allegation in declining to award punitive damages.

### B.

■ The claim that the $8,000.00 award was excessive is without merit. Likewise, so is the claim that the issue of future damages should not have been submitted to the jury. The jury was carefully instructed on the issue of damages.[7]

---

**6.** This definition of "willful" is consistent for example with the definition of "willful" under the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.* *See Empire-Detroit Steel Division, Detroit Steel Corporation v. Occupational Safety & Health Review Commission*, 579 F.2d 378 (6th Cir. 1978).

**7.** The instruction on damages read: "If your verdict is for plaintiff, for negligent non-compliance, then your duty is to determine the amount of money which reasonably, fairly, and adequately compensates him for the damage which you decide resulted from defendant's failure to comply. You should include each of

*Collins v. Retail Credit Co.*, 410 F.Supp. 924 (E.D.Mich.1976) and *Millstone v. O'Hanlon Reports, Inc.*, 383 F.Supp. 269 (E.D.Mo. 1974), aff'd, 528 F.2d 829 (8th Cir. 1976) support this conclusion. In each of these cases there was no out-of-pocket expense. Embarrassment and humiliation were both held to be proper elements of damages for jury consideration. As pointed out in *Rasor v. Retail Credit Company*, 87 Wash.2d 516, 554 P.2d 1041, 1050–1051 (1976), under the Act the amount of damages is within the discretion of the jury; the Court should not substitute its judgment as to the amount; and unless an award shocks the conscience or appears to have been arrived at by passion or prejudice it ought not be disturbed. See also: 11 Wright & Miller, *Federal Practice and Procedure* § 2807 (1973). An award of $8,000.00 does not shock the Court; nor does the Court believe there is anything in the record to suggest passion or prejudice played any role in the jury's deliberations.

### C.

▮ While there may be a superficial appeal to defendant's claim that a consumer reporting agency ought not be required to determine the inherent accuracy of the information it receives and that in effect is what was required of it under the record in this case, upon careful analysis it is clear that the jury's finding of liability makes no such demand.[8]

The jury was specifically instructed that if it found the mortgage reports were accurate in the information they contained it was to find for defendant. The evidence was overwhelming that the information in the reports was not in fact accurate. Cases such as *Roseman v. Retail Credit Co., Inc.*, 428 F.Supp. 643 (E.D.Pa.1977); *Todd v. Associated Credit Bureau Services, Inc.*, 451 F.Supp. 447 (E.D.Pa.1977); *Middlebrooks v. Retail Credit Co.*, 416 F.Supp. 1013 (N.D.Ga. 1976); and *Austin v. Bankamerica Service Corp.*, 419 F.Supp. 730 (N.D.Ga.1974), where the court found that the information in the report was in fact accurate, are simply not on point.

The determining factor, once the information in a consumer report is found to be inaccurate in fact, is whether the consumer reporting agency maintained reasonable procedures to assure maximum possible accuracy. The question is what they did or did not do in preparing the report. *Lowry v. Credit Bureau, Inc. of Georgia*, 444 F.Supp. 541 (N.D.Ga.1978).

> "Preparation may be viewed as a continuing process and the obligation to insure accuracy arises with every addition of information.

. . . . .

> To permit the activity encountered here to go uncovered would be contrary to the

---

the following elements of damage which you decide has been sustained by the plaintiff to the present time:
(a) mental anguish;
(b) embarrassment;
(c) humiliation.
You should also include each of the following elements of damage which you decide plaintiff is reasonably certain to sustain in the future:
(a) mental anguish;
(b) embarrassment;
(c) humiliation.
If any element of damage is of a continuing nature, you shall decide how long it may continue.
Which, if any, of these elements of damage has been proved by plaintiff is for you to decide, based upon evidence and not upon speculation, guess or conjecture. The amount of money to be awarded for certain of these elements of damage, such as mental anguish, can-

not be proved in a precise dollar amount. The law leaves such amount to your sound judgment.
Denial of or delay in granting credit does not constitute damage in and of itself under the law.
Damages for embarrassment, humiliation and mental anguish will not be presumed to have occurred, plaintiff must prove they have occurred."

8. At oral argument defendant suggested a distinction in what is required depending on whether it is a "consumer report" § 603(d) or "investigative consumer report" § 603(e) and in the former case limiting liability where the information received is "accurately reported." The Act makes no such distinction; nor did defendant furnish any authority to suggest such a distinction.

broadly remedial aims disclosed in 15 U.S.C. § 1681."

444 F.Supp. 541, 544.

See also, McPhee v. Chilton Corporation, 468 F.Supp. 494, 496 (D.Conn.1978), ("Some duty of evaluation is imposed on reporting agencies by the Credit Act, at least by implication.") and Hauser v. Equifax, Inc., 602 F.2d 811 (8th Cir. 1979), (Inaccuracy itself is not the touchstone).

### D.

The language of the Act itself, its legislative history, Federal Trade Commission interpretations and industry commentary are each contrary to defendant's position.

The Act carefully distinguishes the levels of proof required with regard to various allegations of failure to follow the requirements of the Act. The language of § 607(b), "follow reasonable procedures to assure maximum possible accuracy", should be contrasted to the language in § 606(c) (disclosure) "No person shall be held liable . . . if he shows by a preponderance of the evidence that . . . he maintained reasonable procedures to assure compliance." The language of these sections in turn should be compared to the language of § 610(e) setting the standard for an action by a consumer in the nature of defamation or invasion of privacy, i. e., "false information furnished with malice or willful intent to injure such consumer."

These variations in language suggest not only a variation in the standards of proof for actions under these sections but a need to assure that jury instructions properly reflect such variations. Defendant's position would engraph a special limitation on the standard set by § 607(b). See: Thornton v. Equifax, Inc., 619 F.2d 700 (8th Cir. 1980).

Turning to committee reports and Congressional discussion preceding passage of the Act the Court finds a careful consideration of the meaning intended for § 607(b)

and §§ 616 and 617. Section 607(b) and § 617 were added by the House of Representatives. The Statement of the Managers on the Part of the House, Conf. Rep. No. 91–1587, 91st Cong., 2d Sess. 2, reprinted in [1970] U.S.Code Cong. & Admin.News, p. 4411, advises that the House offered an amendment to add the language of § 607(b) to assure maximum possible accuracy of the information on an individual in all consumer reports and with regard to § 617 that a House amendment was agreed to to establish ordinary negligence as the standard instead of gross negligence as provided in the Senate version of the bill.

In the Congressional Record, S 17635, October 9, 1970, the reason for the change was explained as providing a greater incentive for reporting agencies to comply with the Act, Senator Proxmire saying,

"Thus, for example, if a reporting agency fails to follow reasonable procedures to assure the maximum possible accuracy of information in a credit report and is negligent in doing so, a consumer has a right to bring a civil action to recover any actual damages sustained."

The debate in the House of Representatives described the standard as "ordinary acts of negligence," Cong.Rec. H 11051, Oct. 13, 1970.

Interpretations of the Federal Trade Commission are to like effect.[9] In an FTC Unofficial Staff Interpretation, FTC No. 162, a consumer reporting agency's obligations under § 607(b) are explained as follows:

"However, Section 607(b) of the Act imposes upon credit bureaus the affirmative obligation to maintain reasonable procedures to assure maximum possible accuracy of the information contained in a consumer report.

The exact nature of a 'reasonable procedure' is determined by the circumstances surrounding the operation of credit bureau and may vary from credit bureau to credit bureau. As you know, the Com-

---

**9.** While the Federal Trade Commission's views are not binding, they are authoritative in the sense Congress gave it the power to administer the Act, § 621. See, McPhee v. Chilton Corporation, 468 F.Supp. 494, 496, fn. 4 (D.Conn. 1978).

mission was specifically denied the power to issue substantive rules and regulations under the Fair Credit Reporting Act and, therefore, may not specify the precise procedures which credit bureaus must follow on an industry-wide basis, but must litigate the question on a case by case basis.

At least one local court has construed Section 607(b) to require the Credit Bureau _____ to verify the accuracy and completeness of all adverse information it reports on consumers. *Miller v. Credit Bureau, Inc. of Washington, D.C.,* Superior Court of the District of Columbia, No. SC–25451–711, June 22, 1972 (excerpts enclosed)."

Lastly, an early industry publication explained a consumer reporting agency's obligations under § 607(b) as follows:

"As with the preceding paragraph, you have some flexibility and the law does not spell out what reasonable procedures you must follow. Congress believed that you and the credit granter and the consumer would best determine that, and if there was a conflict, the courts could decide if the procedure was reasonable. This does not give you the license to do anything you please but it recognizes that a procedure may differ between credit bureaus, and both procedures may be perfectly acceptable.

If, for example, you consistently reported the wrong information on the wrong John Smith after Smith followed the law and came in to correct your records, you obviously have not established a 'reasonable procedure' with your interviewing department and the file department to assure the maximum possible accuracy of his record. He most likely has a cause of action against your bureau."

And again as to § 617,

"It is important for the credit bureaus and credit granters to remember in this section that it is the duty of the consumer to prove not that you made a mistake in compiling the information in his report, but rather that you were negligent in compiling it. This necessitates that he prove that you do not use reasonable procedures." [19]

### E.

The position urged by defendant simply has no support in the language of the Act, its legislative history, Federal Trade Commission interpretations, industry information bulletins, or the cases.

To accept defendant's position would mean, among other things, that it had no obligation to compare the information contained in the May report to the information it received for the September report even though on their face the two reports appeared inconsistent; and it would also mean that defendant could ignore plaintiff's expressed concern about the inaccuracies in the proposed report before it delivered the report. To accept this interpretation of a consumer reporting agency's obligations would make defendant simply a conduit and eliminate from the Act its emphasis on the reasonableness of the procedures followed in putting together a consumer report. This is not what Congress intended.

Once it is determined that a consumer report is in fact inaccurate, Congress has committed to a jury determination the question of whether the consumer reporting agency compiling the report followed reasonable procedures to assure maximum possible accuracy of the information contained in the report. The standard of conduct by which the agency's action is to be judged is deeply rooted in the law of negligence: what a reasonably prudent person would do under the circumstances.[11]

### VII.

Here a jury determined that plaintiff had been damaged to the extent of $8,000.00 by

---

**10.** Taken from a publication prepared by Associated Credit Bureaus, Inc. as quoted in the *Fair Credit Reporting Manual,* Revised Edition (1977), App. H–3, by Ralph C. Clontz, Jr., Warren, Gorham and Lamont.

**11.** *See* Prosser, *The Law of Torts* § 32 (4 Ed. 1971).

defendant's failure to do what a reasonably prudent person would do under the circumstances. No sufficient reason has been given this Court to set aside the judgment or grant a new trial. *Morelock v. NCR Corp.*, 586 F.2d 1096 (6th Cir. 1978); Fed.R.Civ.P. 61.[12]

Zimmerman & Zimmerman, New York City, for plaintiff; Edward D. Lory, New York City, of counsel.

Lilly, Sullivan & Purcell, P. C., New York City, for defendant; Thomas E. Stiles, New York City, of counsel.

---

12. The Court has under consideration a petition for attorney's fees, § 617.

