**Bennie BRYANT, Plaintiff-Appellee,**

v.

**TRW, INC., Defendant-Appellant.**

**No. 80–1380.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 9, 1981.

Decided Sept. 20, 1982.

Roselyn C. Komisar, Sidney L. Frank, Frank & Stefani, Troy, Mich., Eric D. Green (argued), Boston University School of Law, Boston, Mass., for defendant-appellant.

Forrest Walpole (argued), Walpole, Holmes & Schrope, Caro, Mich., Sidney L. Frank, Troy, Mich., for plaintiff-appellee.

Before EDWARDS, Chief Judge, ENGEL, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

Defendant, a credit reporting agency, appeals from an adverse judgment based on a jury verdict of $8,000 in actual damages and an attorney's fee award of $13,705, which resulted from a suit prosecuted by plaintiff, an individual who was seeking credit for the purchase of a house. The verdict represented a finding that defendant had supplied inaccurate information to a mortgage company and had thereby caused the denial of plaintiff's home loan application. The home loan was eventually approved.

The credit reporting agency was TRW Inc., an Ohio corporation; the prospective mortgagor was an individual named Bennie E. Bryant; and the mortgage company was the Hammond Mortgage Corporation of Southfield, Michigan.

The central issue in this case—which has stirred considerable interest in the credit industry—is whether or not defendant violated section 607(b) of the Fair Credit Reporting Act (FCRA),[1] 15 U.S.C. § 1681e(b), which reads:

> Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

Negligent noncompliance with any requirement of the FCRA gives rise to liability for "any actual damages" and "reasonable attorney's fees," FCRA § 617, 15 U.S.C. § 1681*o;* willful noncompliance, in addition, gives rise to liability for punitive damages, FCRA § 616, 15 U.S.C. § 1681n.

I

The dispute that resulted in this appeal began to form in August 1976, when plaintiff applied to the Hammond Mortgage Corporation for a federally-insured home loan under a program administered by the Veterans' Administration. At the request of Hammond, defendant prepared a "consumer report"[2] on plaintiff. For the background and outline of the instant litigation, we rely on the opinion of the District Judge:

> Beginning sometime in the early 1970's defendant, one of the largest consumer reporting agencies in Michigan, issued consumer reports on plaintiff. On a number of occasions these consumer reports were inaccurate and on a number of occasions plaintiff discussed in person with representatives of defendant his concerns and also went to his creditors,

---

1. The Fair Credit Reporting Act, Pub. L. No. 91 508, 84 Stat. 1127 (1970), is codified at 15 U.S.C. §§ 1681 81t.

2. Although the document prepared by defendant is known in the industry as a "mortgage report," it is a "consumer report" within the meaning of the FCRA.

> The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes . . . .

FCRA § 603(d), 15 U.S.C. § 1681a(d).

principally retail merchants, in an endeavor to straighten out information sent to defendant on his accounts.

In May of 1976 defendant issued a consumer report in the form of a mortgage report on plaintiff in connection with a mortgage application on a house purchase. This consumer report contained inaccurate information on plaintiff's account with a retail merchant. Plaintiff went to defendant and called its attention to the inaccuracy. The mortgage loan did not close for unrelated reasons.

In August, 1976 plaintiff again signed a mortgage loan application for a home purchase. On September 7 the mortgage company ordered a consumer report in the form of a mortgage report. On September 28 an employee of defendant called the mortgage company to advise that the mortgage report would contain four items of derogatory information on plaintiff. The mortgage company immediately advised plaintiff. Plaintiff the same day went to defendant's office and discussed in detail the four items. Three of these items did not appear in the May report even though at least one of these items related to events prior to May, 1976 and logically should have been part of the May report. Subsequent to September 28 the creditors involved advised defendant the information they previously furnished was erroneous.

At the September 28 personal meeting between plaintiff and a representative of defendant, a memorandum was placed in plaintiff's file which reads:

"9–28–76 Cus' wanted us to re-check Ford Mtr Credit.—showed 6 [16] late charges on most recent clearing (read to mortg. company—file not typed yet).

Recleared thru adjuster $\pm$ FMC.—wanted it shown as pd. acc't.—Gone to Mabel. Told cus. I would review file before it was sent. Also gave him copy of Mgr. attention which is read to creditors. JJW."

The mortgage report was sent to the mortgage company on September 30 in its original form without any further attempt on defendant's part to verify the derogatory items.[3]

The mortgage loan was initially denied on the basis of the mortgage report. Subsequently, with a revision in the mortgage report and through plaintiff's personal efforts the mortgage loan closed.

Plaintiff testified as to the embarrassment, anxiety, humiliation and emotional stress he suffered as a consequence of his difficulties over the two reports. No out-of-pocket expenses or actual dollar losses were proven.

*Bryant v. TRW, Inc.*, 487 F.Supp. 1234, 1346–37 (E.D. Mich. 1980).

At the close of evidence, the District Judge read the following, and we think correct, instructions to the jury:

The Fair Credit Reporting Act required that TRW, Inc., when it prepared a consumer report on Bennie Bryant, follow reasonable procedures to assure maximum possible accuracy of the information concerning Mr. Bryant.

If you find that TRW, Inc. was negligent in following the requirements of the law, you should award Mr. Bryant the actual damages sustained by him because of such negligence.

If you find TRW, Inc. willfully failed to follow the requirements of the law, Mr. Bryant is entitled to his actual damages and you may also award punitive damages.

---

**3.** We do not entirely agree with the District Judge's conclusion in this paragraph and elsewhere in his opinion that, aside from whatever effort it made to check the Ford Motor Co. entry, defendant made no attempt between September 28 and September 30 to verify or recheck the derogatory information contained in the mortgage report. *Bryant v. TRW, Inc.*, 487 F.Supp. 1234, 1237, 1239 (E.D. Mich. 1980). The record reflects that the manager of defendant's consumer relations department telephonically contacted at least two of the four creditors involved after the meeting of September 28 and before the report was issued. App. 328–29. The two creditors repeated the same information they had conveyed earlier, *see id.*, and defendant, therefore, did not amend the report. But, in addition, the record shows that defendant's employee made no effort to confirm the accuracy of their representations, *see id.*, which were later found by the jury to be inaccurate.

If you find TRW, Inc. followed reasonable procedures you should find for it. App. 355–56.

The jury returned a verdict of $8,000 in actual damages; it awarded no punitive damages. The trial judge granted plaintiff's motion for attorney's fees in the amount of $13,705, which was calculated on the basis of an hourly rate.

Defendant filed a motion for judgment n.o.v. and an alternative motion for a new trial, arguing principally that section 607(b) of the FCRA does not give rise to liability when a consumer reporting agency, like defendant, accurately reports the information it receives from a consumer's creditors. The motions were denied. *Bryant v. TRW, Inc.,* 487 F.Supp. 1234 (E.D. Mich. 1980).

## II

■ The September 30 mortgage report, as noted by the District Judge in his factual summary, contained "four items of derogatory information on plaintiff." They were:

| | |
|---|---|
| Ford Motor Credit | 4–72 high $3700 auto reported 3–75 paid account, was 17 times 30 days late. |
| Hughes & Hatchers | open for over 10 years limit $700 high $174 balance $159 was 30 days delinquent is now current. |
| J.L. Hudsons-time pay | opened 3–75 limit & high $500 balance $285 $22.00 past due 30 days delinquent. |
| Grinnells | opened 3–76 high $231.16 24 @ $11.96 last paid 8–15–76 due for 7–22–76, as of 9–2–76. |

App. 390.

A review of the testimony in this record indicates to us that in the instance of at least two of the four entries set out immediately above, Hudson's and Grinnell's, plaintiff presented evidence from which the jury could have found inaccuracies that contributed meaningfully to the October 26, 1976, denial of plaintiff's home loan application.

Based on the testimony of Joseph L. Busher, Jr., the manager of Hudson's Customer Credit Relations Department, we think the Hudson's entry was an inaccurate (and misleading) description of plaintiff's status with Hudson's. Busher explained that a customer with a time payment account is obligated to make a minimum payment every month. App. 151. A payment in excess of the minimum would not affect that obligation. If no payment is made in a given month, the account is considered to be "one payment delinquent" on the first day of the following month. App. 158. Payments made thereafter are credited first to the delinquency and then to the current monthly obligation.

Plaintiff's minimum monthly payment was $22 in 1976. As his payment record, App. 362, indicates, he missed his payments in December 1975 and February 1976. Those delinquencies were made up with double payments in April and May 1976. He then made his June payment, so as of that time plaintiff was paying as agreed and was not delinquent.

Plaintiff made two $22 payments in July, which, of course, satisfied his July obligation. However, they did not cancel his August obligation. No payment was made in August, so as of September 1 plaintiff's account was one payment delinquent. A $22 payment was made September 2. Although this rectified the August delinquency, App. 159–60, the September payment remained due. However, plaintiff had until the last day of September to make his September payment, App. 160, and thus, the account could be considered delinquent again no earlier than October 1.

On September 28, defendant's tentative report listed plaintiff's account as 30 days delinquent. And on September 30 the mortgage report indicating the same was issued.

The Hudson's entry was inaccurate for two reasons. First, on September 30 Bryant's account was not delinquent. Second, as Busher testified, delinquencies in time payment accounts are measured in terms of payments, not days:

Q As of the 1st day of September he was delinquent for the August payment, right?

A Right, sir.

Q  At that point isn't he one day delinquent?

A  No, he is delinquent a payment.

App. 159.

Turning to the Grinnell's entry, it is clear that plaintiff disputed the information when he met with the manager of defendant's consumer relations department, Jan Wilkins, on September 28. Wilkins called Grinnell's, and Grinnell's confirmed the information as well as the date on which it was issued: the printout containing the information was dated September 2. App. 328. Accurate on September 2, the printout became stale and on September 28 was plainly inaccurate, for plaintiff had made payments on September 3 and September 20.[4]

As to Hughes & Hatcher and Ford Motor Credit, while plaintiff presented testimony as to some inaccuracies, it seems doubtful to us that this testimony could have affected the verdict. In any event, plaintiff's claims of inaccuracies and damage which flowed therefrom along with defendant's rebuttal on both scores were all fully submitted to the jury for its consideration. We feel the submission was appropriate and that the balance between the competing factual claims was properly struck by the jury in its relatively modest verdict in favor of plaintiff.

### III

The critical issue in this appeal, however, is whether or not the case should have been submitted to the jury at all. Defendant does not contest many of the inaccuracies. Its basic defense is that the inaccuracies were those of plaintiff's creditors and that, under section 607(b), all it had to do

was report accurately whatever information the creditors furnished.

Thus, it appears to this court that the critical legal issue in this case is whether or not section 607(b) requires a consumer reporting agency to do more than correctly report the information supplied to it by creditors. Reviewing the language and legislative history of the statute, we answer this question affirmatively.

In this regard, section 607(b) provides:

Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 U.S.C. § 1681e(b).

Acceptance in full of the position urged on this court by defendant and amicus curiae Associated Credit Bureaus, Inc. would, we believe, serve essentially to repeal by judicial decree a statute that Congress adopted after much consideration in lengthy hearings. Congress chose to require consumer reporting agencies to "follow reasonable procedures to assure *maximum possible accuracy of the information* about whom the report relates."

Although the legislative history of section 607(b) is sketchy and compels neither acceptance nor rejection of defendant's position, two aspects of that history dealing with amendments to the original Senate bill insisted on by the House conferees support a broad reading of the duties imposed by the statute:

(1)

PROCEDURES TO INSURE ACCURACY

The Senate bill required reporting agencies who prepared investigative re-

---

4.  Not only was the Grinnell's entry inaccurate because it was stale, it was inaccurate because it did not reflect the information transmitted to defendant by Grinnell's. Although the entry reads in part, "last paid 8–15–76 due for 7–22–76," Wilkins' testimony included the following exchange:

Q  Did you call Grinnell's?
A  Yes, I did.
Q  What information did you receive from them?

A  My notes show:
"Last paid 7–22, due 8–15 as of 9–30," and that was a printout from 9–2.
Q  What does that all mean in everyday language?
A  Well, it meant as of a printout that they had dated 9–2 Mr. Bryant had last paid on his account 7–22, and he was still due for 8–15, for his August 15th payment.
App. 328.

ports to follow reasonable procedures to assure the maximum possible accuracy of such report. The House conferees felt that this requirement should be extended to all reporting agencies, whether they prepared investigative reports or conventional credit reports. The Senate conferees felt that this was a reasonable requirement and accepted the House amendment.

116 Cong. Rec. 35940 (1970) (remarks of Sen. Proxmire introducing the conference report).

Investigative consumer reports contain "information on a consumer's character, general reputation, personal characteristics, or mode of living," which is gathered through personal interviews. 15 U.S.C. § 1681a(e). These reports are generally used by employers in their hiring practices and by insurance companies and are put together with greater care than conventional credit reports because of the sensitive and subjective nature of the information involved and the manner in which the information is obtained. *See generally Millstone v. O'Hanlon Reports, Inc.,* 383 F.Supp. 269, 275 (E.D. Mo. 1974), *aff'd,* 528 F.2d 829 (8th Cir. 1976). We are persuaded that by extending to conventional credit reports the requirement of "reasonable procedures to assure maximum possible accuracy," Congress evinced its desire that agencies that assemble conventional credit reports be more than conduits of information and its belief that accurate credit information is as important as accurate personal information.

(2)

## CIVIL LIABILITY FOR NEGLIGENT NONCOMPLIANCE

The House amendment to section 617 [15 U.S.C. § 1681o], which was agreed to by the conferees, would establish liability for actual damages sustained as a result of ordinary negligence, instead of only as a result of gross negligence as provided in the Senate bill.

Conf. Rep. No. 1587, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Ad. News 4411, 4416.

This tends to show, we believe, that Congress rejected the imposition of only a nominal standard of care on the credit reporting industry.

In sum, we hold that a consumer reporting agency does not *necessarily* comply with section 607(b) by simply reporting in an accurate manner the information it receives from creditors.

## IV

■ Each case under this statute will vary on the facts, and each must be judged on its own merits. It is clear, as defendant contends, that liability does not flow automatically from the fact that a credit reporting agency, such as defendant, reports inaccurate information. *Hauser v. Equifax, Inc.,* 602 F.2d 811, 814–15 (8th Cir. 1979); *see Austin v. Bankamerica Service Corp.,* 419 F.Supp. 730, 733 (N.D. Ga. 1974). Instead, liability flows from failure to follow "[ (1) ] *reasonable procedures* [ (2) ] to assure *maximum possible accuracy of the information* [ (3) ] *concerning the individual about whom the information relates.*" We agree with the Fifth Circuit and the District Judge that "[t]he standard of conduct by which the trier of fact must judge the adequacy of [consumer reporting] agency procedures is what a reasonably prudent person would do under the circumstances." *Thompson v. San Antonio Retail Merchants Association,* 682 F.2d 509, 513 (5th Cir. 1982) (per curiam) (citing *Bryant v. TRW, Inc.,* 487 F.Supp. 1234, 1242 (E.D. Mich. 1980)).

■ The salient facts with respect to the question whether defendant followed reasonable procedures before it issued the mortgage report on September 30 include (1) defendant's prior contact with plaintiff and, in particular, its familiarity with plaintiff's troubled credit history with Hudson's, which centered on two disputes arising from errors made by Hudson's, *see* App. 359–61, 375, and (2) the September 28 meeting between plaintiff and defendant's consumer relations manager, at which plaintiff fervently complained about three and perhaps all four of the four pieces of derogatory information on the tentative report fur-

nished to the Hammond Mortgage Corporation. Absent these facts, we would have a quite different case. However, they exist and are relevant to this case, and the District Judge was correct in admitting them into evidence.

Defendant's effort to "assure maximum possible accuracy of the information" in the mortgage report comprised two phone calls, the record indicates. The calls, one to Hudson's, the other to Grinnell's, simply reconfirmed the information—inaccurate information it turns out—furnished earlier to defendant by the creditors concerned.

On the record of this case, we believe that defendant was required to do more under section 607(b). It would have taken little added effort immediately to advise the creditors of plaintiff's complaints and to request investigation and re-evaluation based on the most recent data. And it would have taken little added effort to ask Hudson's how they calculated that defendant was 30 days delinquent or to ask Grinnell's if any payments had been made after September 2. Although the inaccuracies were eventually corrected, the corrections were made after the rejection of plaintiff's home loan application, his consequent frustration, and the denigration of his name and creditworthiness.

In this record, we call attention to the language of one of the House sponsors of the FCRA. On October 13, 1970, Representative Sullivan said concerning the Act:

It would be difficult to predict which of the many provisions of H.R. 15073 will turn out to be the most significant from a long-range standpoint; all of the sections of H.R. 15073 have importance to some aspect of our economy and to the public interest. But in an era of expanding consumer credit and proliferating techniques for managing or handling such extension of credit, and in view of the increasing importance to the individual of having access to insurance as well as the vital necessity of being able to find employment, I believe that the sections of this bill dealing with credit and personal data reporting will have the greatest overall impact. *The reason I say that is that with the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home.* We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason.

The loss of a credit card can, of course, be expensive, but, as Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed. This bill's title VI deals with that problem. 116 Cong. Rec. 36570 (1970) (emphasis added).

We have no doubt from this record that plaintiff offered proofs from which the jury could properly have found that defendant's failure in timely fashion to use "reasonable procedures to assure maximum possible accuracy" occasioned damage to plaintiff's name and consequent anguish and humiliation.

V

Furthermore, we do not find any reason to set aside the District Judge's award of attorney's fees. It appears that he followed this court's standards in *Northcross v. Board of Education*, 611 F.2d 624 (6th Cir. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). We have no doubt that Congress intended in authorizing attorney's fees in lawsuits under the FCRA, 15 U.S.C. §§ 1681n, 1681o, to make use of the private attorney general concept. *Cf. Albermarle Paper Co. v. Moody*, 422 U.S. 405, 415, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975) (Title VII of the Civil Rights Act of 1964); *Northcross v. Board of Education*, 412 U.S. 427, 428, 93

**80**

S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973) (per curiam) (Emergency School Aid Act of 1972); *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 401–02, 88 S.Ct. 964, 965–66, 19 L.Ed.2d 1263 (1968) (per curiam) (Title II of the Civil Rights Act of 1964); *see also Northcross v. Board of Education,* 611 F.2d 624, 633 (6th Cir. 1979) (Civil Rights Attorney's Fee Award Act of 1976), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980).

The fact that the attorney's fees in this case, $13,705, exceeded plaintiff's actual damages, $8,000, does not argue for a reduction of the former. The fees were calculated on the basis of an hourly rate, but defendant contends that the purpose of the FCRA's allowance for attorney's fees could be as efficaciously achieved by calculating fees on the basis of a contingent fee.

We reject this contention because we believe that the policies informing the Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. § 1988, which led this court in *Northcross* to "conclude that a fee calculated in terms of hours of service provided is the fairest and most manageable approach," 611 F.2d at 636, apply with equal force to the FCRA. In a recent housing discrimination case, this court observed:

> The purpose of Section 1988 is to encourage lawyers to accept civil rights cases in which damages may be small, nominal or nonexistent. *Northcross* has the effect of guaranteeing that a lawyer will be awarded fees for all of his hours reasonably spent in presenting the issues on which his side prevailed. Greatly reduced fees, such as were awarded in this case, will discourage lawyers from accepting housing discrimination cases and vindicating the rights Congress had in mind. Another reason for following *Northcross* is the need for consistency in determining attorney fees.

*Kinney v. Rothchild,* 678 F.2d 658, 660 (6th Cir. 1982) (per curiam).

## VI

While other issues are argued with vigor by defendant and amici, we feel they are adequately answered in the District Court opinion. For the reasons given above and those further explicated in Judge Cohn's opinion, the judgment of the District Court is affirmed.