Anita KIRCHOFF and William Kirchoff, Plaintiffs-Appellants,

v.

Michael FLYNN, et al., Defendants-Appellees.

No. 85–2187.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 24, 1986.

Decided March 17, 1986.

Edward T. Stein, Singer & Stein, Chicago, Ill., for plaintiffs-appellants.

Maureen Kelly Ivory, Asst. Corp. Counsel, Chicago, Ill., for defendants-appellees.

Before POSNER and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Arrested for feeding the pigeons and walking her dogs in the park, Anita Kirchoff recovered $25,000 from the police. The defendants gave up, but Kirchoff's lawyers did not. They wanted some $50,-000 in fees under 42 U.S.C. § 1988. The district court gave them $10,000 on the ground that their contingent fee contract with the Kirchoffs entitled them to 40% of any award. The case requires us to decide whether the contingent fee is the appropriate rate under § 1988 when the case resembles private tort litigation in which contingent fees are customary. First, however, we pause for the facts.

I

Anita Kirchoff regularly allowed her dogs to roam without leases in Washington Park in Chicago, about a half block from her home. While in the park · with the dogs, she would feed the pigeons.[1] Mi-

1. Anita Kirchoff will never be confused with the 30th Earl of Mar, whose hobby was kicking

chael Flynn, a sergeant of the Chicago Police, twice told her that the dogs must be leashed and the pigeons left to their own devices. On May 8, 1982, Flynn saw Kirchoff, her unleashed dogs, and a pigeon enjoying Kirchoff's largesse. As Flynn tells the tale, he and officer Mary Siwak tried to give Kirchoff a citation. To find out who they were citing, they asked Kirchoff her name and address. She balked, and they arrested her, maintaining that when a person being cited will not provide the necessary details, regular procedure requires the arrest. As Kirchoff tells the tale, the police knew who she was, so it was unnecessary for her to provide identification.

Because the police did not have a cell suitable for the two dogs, and the parakeet Kirchoff happened to have in hand, they escorted Kirchoff home, so that she could park her menagerie. At her home they found William Kirchoff, Anita's husband. Anita told her husband that she had been arrested; he responded with some unprintable remarks and punched officer Siwak. (Who started the scuffle will remain a mystery.) Apparently both William and Anita Kirchoff are skilled in karate (the police state that they have black belts), and the officers called for help. By the time help arrived in the person of Lt. Chausse and his paddy wagon, Flynn and Siwak had William Kirchoff in handcuffs. He had been kicked in the groin (self-defense, according to Flynn) and was bleeding about the head. William says that he was clobbered by a pair of handcuffs; Flynn maintains that the Kirchoffs' red macaw drew the blood when it landed on William's head during the fracas and started pecking.[2]

William was trundled to the squadrol, and the police turned their attention back to Anita. All the police had left the house with William; while they were gone, Anita locked the door and refused to let them back in. The police say (and Anita denies) that they thrice asked her to open the door. The police ultimately kicked in the door and took Anita into custody. They left a neighbor and an unknown number of dogs, birds, and other animals to guard the Kirchoffs' house. William refused treatment at the hospital to which the police took him. Both Kirchoffs were booked and stayed in jail until the wee hours of the next morning. William spent ten hours in jail, Anita nine.

Anita was prosecuted for littering (dropping bird seed on the ground), feeding a bird, allowing her dogs to run unleashed, and resisting arrest (by locking herself into the house). The state judge convicted Anita of omitting the leash but otherwise acquitted her. The charge of feeding the pigeons had no legal basis. Section 30–7.6 of the park regulations states that "[n]o person shall feed animals in any zoo area except unconfined squirrels, sparrows, pigeons and ducks." Even if Washington Park is a "zoo area," Anita was on safe ground unless some robins or perhaps the parakeet hopped in for a meal.[3] The charge concerning the dogs was more substantial. Section 30–7 requires dogs and cats in the parks to be "continuously restrained by a leash not exceeding six (6) feet in length. . . ." The penalty for allowing dogs to run unleashed in the park is time in the pound (for the dogs only), see Section 30–7.10. The prosecutor asked for 30 days, but the judge apparently sentenced these dogs to time served.

William Kirchoff was charged with obstructing the police in their arrest of Anita and with battery of officers Flynn and Siwak. He was acquitted on all counts.

pigeons. See his entry in *Who Was Who 1971–80*, 520 and his obituary by Auberon Waugh, in *Private Eye* (1975). Hear, e.g., Tom Lehrer, *Poisoning Pigeons in the Park* (1959).

2. Predatory birds rarely attack large animals whose eyes they can see, 11 Harv.Med. School Health Letter 8 (Feb.1986), and perhaps William's eyes got distracted, to his macaw's glee.

3. Flynn was carrying a booklet of park regulations dated 1973, which included a rule against feeding birds in the park. The police apparently did not have copies of the new book of rules dated 1981.

This suit under 42 U.S.C. § 1983 turned the tables. The complaint charged the officers with assault, battery, false arrest, and malicious prosecution, all in violation of the fourth, fifth, and fourteenth amendments, and with several pendent state claims. Without stating reasons, the district court granted Anita's motion for summary judgment with respect to liability. About a month before the trial the defendants offered $42,000 to settle the matter; the Kirchoffs held out for more. The jury fixed Anita's damages at $25,000 and ruled for the defendants on William's claims. See also *$25,000 for the Birds*, 71 A.B.A.J. 31 (June 1985). Neither side has appealed on the merits, so we shall not need to inquire why the court granted summary judgment in a case that apparently turns on whose story one believes. We also need not examine the $25,000 verdict, which is $2,778 for each hour Anita spent in custody.

The defendants missed a good bet when they neglected to make an offer of judgment under Fed.R.Civ.P. 68. The Kirchoffs recovered less than $42,000, so under *Marek v. Chesny*, —— U.S. ——, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985), an offer would have stopped the running of attorneys' fees. They did not, however, and the Kirchoffs' lawyers asked for fees of $49,732.50, representing 331.55 hours of work at $150 per hour. More than 180 of these hours came after the offer of settlement. The defendants argued that the request was excessive. William Kirchoff had lost outright, and Anita had won on liability without a trial. The time spent on William's claims should be excluded, the defendants contended. The case was marginally successful from the plaintiffs' perspective; no plaintiff is happy to take home only 60% of the last settlement offer. The defendants also challenged the hourly rate of $150 and the need to devote 332 hours (more than eight weeks of full time work) to litigating the events of May 8. One lawyer would have done; the plaintiffs used two for parts of the case. The defendants recomputed the hours and hourly fees, coming up with a proposed award of about $5,000.

Although the positions with respect to fees differed by an order of magnitude, the district court did not hold a hearing. Instead the judge decided the matter from the bench. After first remarking that he had not seen the agreement between the Kirchoffs and their lawyers concerning fees, he asked whether the agreement provided a contingent fee. One lawyer replied that it did: one-third if settled before the pretrial order, 40% if things went farther. The court then observed that the "beginning point ... should be a determination of the market value for the services" and concluded that the market value in a case such as this is the contingent fee.

Treating the case as a personal injury matter in which the constitutional foundation was window dressing, the court thought the state of the law "well settled ... for a number of years. These cases are today to the jurisprudence of the Federal Courts what FELA cases were forty, fifty years ago. They are personal injury cases with a Federal law underpinning. The marketplace for this type of litigation throughout my career at the bar has been the contingent fee contract."

The judge went on to explain that $50,000 was at all events an unsupportable request. William lost, so "[t]he time should be divided in half." More, "this was an easy case to try, an easy case to try.... [T]here just is no need for the two of you to try this case.... This was a fist-fight case and, indeed, you lost that aspect of it." The judge summed up:

> When I take all of these factors into account, I believe that the contingent fee agreement which you reached with your clients is the fair measure of the fee in this case. You recovered a $25,000 award for Mrs. Kirchoff. She agreed to pay you forty percent of that. The philosophy of the Civil Rights Attorney's Fee Act is that she should recover her damages without incurring fees. That the defendant should pay her fees, if those fees are reasonable. So she shifts

that forty percent of $25,000, or $10,000, to the defendants.

## II

A court awarding fees under § 1988 is supposed to compute the "market rate" for the attorneys' work and assess that reasonable fee against the defendants. *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Henry v. Webermeier,* 738 F.2d 188 (7th Cir.1984). In the words of *Henry,* the rate should "simulate the results that would obtain if the lawyer were dealing with a paying client." 738 F.2d at 195. The district judge thought that 40% of the award is the "market rate" for cases of this type; it was, after all, the rate the Kirchoffs themselves negotiated. What could be a better gauge of the market than an actual transaction in it?

The judge never did read the contingent fee contract, and he got its provisions wrong. True, it entitled the lawyers to 40% of the award if the case went to trial. But this was the lawyers' entitlement against the Kirchoffs, not against the defendants. The contract also provided that if the court should award more than 40%, the lawyers would keep the excess; if the court should award less than 40%, the Kirchoffs' net recovery would be reduced. In other words, the 40% in the contract was a floor; there was no contractual ceiling. The district court made the 40% into a ceiling and thereby modified the contract.

There is a more fundamental question: why should we care about this contract? In ordinary tort litigation the contract fixes entitlements. If the plaintiff recovers $25,000, the lawyer gets $10,000 and the plaintiff $15,000. The plaintiff, with money on the line, takes care when negotiating. The Kirchoffs' contract is not about the disposition of their money. As the district court said, the (or a) policy behind § 1988 is to ensure that the plaintiffs keep the whole recovery. So in negotiating a contract such as this, the Kirchoffs were dickering about the defendants' money, not their own.[4] If the contract had said that the fee is to be 60%, would it then be appropriate to award $15,000 to counsel here? The contingent fee may be the market's way to price legal services for this sort of claim, but there is nothing magical about the percentage when the plaintiff expects the defendants to pay the freight.

One logical response would be to say that 40% is the customary fee in tort litigation in which plaintiffs *are* looking out for their own wallets, and the bargains these other plaintiffs strike offer vicarious protection to defendants in cases under § 1988. A court need only match these private bargains to arrive at the "market rate." This would be too facile, however, because the risks plaintiffs face in § 1983 litigation are greater and the rewards smaller. A § 1983 case is not like FELA litigation, in which all but a few defenses have been stripped away. See *Lancaster v. Norfolk & Western Ry.,* 773 F.2d 807, 813 (7th Cir.1985). It is not even like ordinary tort litigation. Although § 1983 creates "a species of tort liability", *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976), and § 1983 suits are "best characterized as personal injury actions" for purposes of determining the statute of limitations, *Wilson v. Garcia,* —— U.S. ——, 105 S.Ct. 1938, 1949, 85 L.Ed.2d 254 (1985), the plaintiff must show more in a § 1983 case than in a case under the common law of torts. Negligence is not itself actionable. *Daniels v. Williams,* —— U.S.——, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The plaintiff must show intentional wrongdoing or at least recklessness in

---

**4.** If the Kirchoffs had lost, they would have paid nothing. If they had won and the judge had awarded less than $10,000, they would have owed money to their lawyers. So it is not strictly accurate to say that *none* of their money was at stake. The point, however, is that plaintiffs in § 1983 litigation ordinarily expect the defendants to pay enough that the plaintiffs do not compensate their own lawyers, and the plaintiffs' incentive to drive a hard bargain with their lawyers is correspondingly reduced.

most § 1983 suits, and every "constitutional tort" will have one or more elements an ordinary negligence suit lacks. See *Gumz v. Morrissette,* 772 F.2d 1395, 1399–1400 (7th Cir.1985). The plaintiff also must overcome any immunity from suit the defendants may possess. See *Mitchell v. Forsyth,* —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct 2727, 73 L.Ed.2d 396 (1982).

A plaintiff suing the police may encounter juries sympathetic to the defendants—more sympathetic, anyway, than juries are apt to be when the defendant is a deep-pocket corporation in a products liability or FELA suit. When the plaintiff wins on the merits, the jury may treat the defendant as having shallow pockets. (Defendants share the common perception that the size of the award varies with the depth of the pocket as well as the seriousness of the injury. Courts ensure that juries do not learn that many defendants in § 1983 suits are indemnified. See Fed.R.Evid. 411. We have held that informing the jury about indemnity is reversible error. *Joseph v. Brierton,* 739 F.2d 1244 (7th Cir.1984); see also *Joynor v. Berman Leasing Co.,* 398 F.2d 875 (5th Cir.1968).) Litigants under § 1983 therefore have a harder time on the merits, and recover less when they win, than plaintiffs in much other tort litigation. The observation that a contingent fee of ⅓ or ⅖ of the recovery fetches adequate counsel in FELA and products liability suits therefore does not demonstrate that the same percentage is the "market rate" in riskier, lower-stakes litigation under § 1983.[5]

This does not mean, however, that contingent fees have no role under § 1988. The "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" is the "most useful starting point" in many cases, *Hensley v. Eckerhart, supra,* 461 U.S. at 433, 103 S.Ct. at 1939, but it is not the only starting point. A court's objective is to find the rates

"prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson, supra,* 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11. When the "prevailing" method of compensating lawyers for "similar services" is the contingent fee, then the contingent fee *is* the "market rate."

The market for legal services uses three principal plans of compensation: the hourly fee, the fixed fee, and the contingent fee. The contingent fee serves in part as a financing device, allowing people to hire lawyers without paying them in advance (or at all, if they lose). It also serves as a monitoring device. In any agency relation, the agent may pursue his own goals at the expense of the principal's. A fixed fee creates the incentive to shirk; a lawyer paid a lump sum, win or lose, may no longer work hard enough to present his client's case. Fixed fees therefore are used only in cases where the client can monitor the results and the lawyer's work (did the lawyer secure the divorce or not?) or where the client (or the client's general counsel) is sufficiently sophisticated to assess what the lawyer has accomplished.

An hourly fee creates an incentive to run up hours, to do too much work in relation to the stakes of the case. An hourly fee may be appropriate where it is hard to define output (in litigation, for example, the outcome turns on the merits and not simply the lawyer's skill and dedication), so the hourly method measures and prices the inputs, the attorney's hours. Again, however, it is necessary to monitor the lawyer's work. The general counsel of a corporation or a sophisticated client may measure inputs well, but in litigation under § 1988 the plaintiff usually has little ability to monitor and also has little incentive to do so, knowing that the defendant will pay the bill. So the court rather than the plaintiff must do the supervision. This in turn creates complex, secondary litigation about fees.

---

**5.** The Kirchoffs' own contract provided that fees vary with risk: 33% if settled before the pretrial order, 40% if settled thereafter or tried, 50% if the defendants should appeal.

Judicial monitoring also is necessarily imprecise. The judge cannot readily see what legal work was reasonably necessary at the time; the judge first sees the application for fees after the case is over, and hindsight may obscure the difficult decisions made under uncertainty as much as it illuminates them. The Supreme Court's oft-repeated wish that litigation about fees not turn into a second major lawsuit (e.g., *Hensley, supra,* 461 U.S. at 437, 103 S.Ct. at 1941) is an unattainable dream. The computation of hourly fees depends on the number of hours "reasonably" expended, the hourly rate of each, the calculation of the time value of money (to account for delay in payment), potential increases and decreases to account for risk and the results obtained, and a complex of other considerations under the heading of "billing judgment." The stakes—in this case the request for fees was double the judgment, in others the request for fees may be millions of dollars—ensure that the parties will pursue all available opportunities for litigation. Cf. *Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.,* 776 F.2d 646 (7th Cir. 1985); *In re Fine Paper Antitrust Litigation,* 751 F.2d 562 (3d Cir.1984). The fuzziness of the criteria (what is a "reasonable" number of hours?) ensures that people seeking opportunities to contest the fees will not need to search hard.

There is no wholly satisfactory way to employ hourly rates when the plaintiff can not or will not monitor his own attorney and the defendant has both incentive and ability to turn the request for fees into a second major litigation. The "lodestar" method makes of the court a public utilities commission, regulating the fees of counsel after the services have been performed, thereby combining the difficulties of rate regulation with the inequities of retrospective rate-setting.

When the use of hourly rates is the norm in the private market, § 1988 requires courts to follow. This will be so, for example, when the litigation does not have a fixed money value, as when the plaintiff principally seeks injunctive relief. The same forces that drive private parties to monitor inputs of attorneys' time rather than particular results must drive the legal system in the same direction. But when private litigants have found that it is more useful to give the lawyer a monetary stake in the recovery through the contingent fee than to monitor inputs of time, courts should be willing to learn from that accumulated experience.

The contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains. This interest-alignment device is not perfect. When the lawyer gains 40 cents to the client's dollar, the lawyer tends to expend too little effort; unless concern for his reputation dominates, he would not put in an extra $600 worth of time to obtain an extra $1,000 for his client, because he would receive only $400 for his effort. Cf. *Chesny v. Marek,* 720 F.2d 474, 477–78 (7th Cir.1984), *rev'd on other grounds,* —— U.S. ——, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985). But imperfect alignment of interests is better than a conflict of interests, which hourly fees may create. The unscrupulous lawyer paid by the hour may be willing to settle for a lower recovery coupled with a payment for more hours. Contingent fees eliminate this incentive and also ensure a reasonable proportion between the recovery and the fees assessed to defendants. Except in grudge litigation, no client, however wealthy, pays a lawyer more than a dollar to pursue a dollar's worth of recovery. Nothing in the legislative history of § 1988 suggests that Congress meant to give civil rights plaintiffs a sort of representation that wealthy people would not purchase for themselves. See *Jones v. Central Soya Co.,* 748 F.2d 586, 593 (11th Cir.1984); cf. *Bonner v. Coughlin,* 657 F.2d 931, 934 (7th Cir.1981). To the contrary, the legislative history recounted in *Hensley* and *Blum* is full of imprecations against "windfalls" for counsel. Yet it is difficult to avoid excessive recoveries of fees under a system based wholly on the number of hours worked. Cf. *Rivera v. City of Riverside,* 679 F.2d

795 (9th Cir.1982), *cert. granted,* —— U.S. ——, 106 S.Ct. 244, 88 L.Ed.2d 253 (1985) (fees more than seven times recovery). Yet if there should be a cap on the total fee, perhaps as some percentage of the recovery, that would argue strongly for general use of contingent fees, which contain not only a cap but also a floor. Without a floor the introduction of a cap would depress average fees below their expected level in the private market.

At the same time as it automatically aligns interests of lawyer and client, rewards exceptional success, and penalizes failure, the contingent fee automatically handles compensation for the uncertainty of litigation. Hourly fees usually are fees that lawyers charge to clients who pay promptly when billed. These fees translate poorly to § 1988 cases, where payment is contingent on success and is delayed until after the end of the litigation. Courts have wrestled with questions concerning multipliers for risk, multipliers for exceptional success, and the treatment of the time value of money. One common concern with compensation for risk is that the multiplier should rise as the probability of success falls, soaking the unlucky defendant who had a good case (more than a 50% chance of prevailing) but lost anyway and therefore faced a huge multiplier. See *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1392–93 (7th Cir.1984). We need not rehearse these struggles, one aspect of which is before the Supreme Court this term. *Delaware Valley Citizens Council v. Pennsylvania,* 762 F.2d 272 (3d Cir.), *cert. granted,* —— U.S. ——, 106 S.Ct. 57, 88 L.Ed.2d 46 (1985). Increasing hourly rates for risk and delay is one way of restoring the hourly rate a lawyer could obtain from a paying client, and a necessary way when the base of the fees must be the hourly rate. Only by offering to pay the lawyer his opportunity wage, the compensation he could obtain by representing paying clients, may a court induce the lawyer to take civil rights cases. Adjustments to produce the anticipated opportunity wage are artificial in the sense that there is no parallel in private markets. The contingent fee contract takes care of this adjustment automatically, yet it never presents defendants with a bill many times the stakes of the underlying litigation. So long as the percentage is set by category of case (as it should be), rather than case by case, defendants with good cases pay no more than defendants with poor ones. The adjustment for risk takes place not in the judge's chambers but in the private market—under a contingent fee system, potential litigants with poor chances simply cannot find counsel. Weak cases stay out of court.

■ For all of these reasons, we agree with the district court that when the private market for legal services employs the contingent fee for "similar services by lawyers of reasonably comparable skill, experience, and reputation" (*Blum, supra,* 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11), so may a court making an award under § 1988. The private market uses the contingent fee for personal injury cases, including torts such as battery, false arrest, and malicious prosecution, the subjects of this case. The district court was entitled to employ a contingent fee as a benchmark, even though for reasons we have explained it was wrong to stop the inquiry with the 40% minimum fee in the Kirchoffs' contract. The district judge must ascertain the appropriate rate for cases of similar difficulty and risk, and of similarly limited potential recovery.

### III

All of the § 1988 cases the Supreme Court has considered sought compensation for hours reasonably expended times the appropriate hourly rate. The principal cases, *Hensley* and *Blum,* both involved requests for injunctions as the principal relief. Legal work seeking injunctions is compensated in private markets by the hour, so that the Court's observation that the "lodestar" method is the appropriate one simply reflected the markets in question. The grant of review in *City of Riverside v. Rivera,* where the lodestar method produced an award many times the dam-

ages recovered, requires the Court to decide whether a lodestar analysis remains appropriate when the case produces a substantial recovery and the claims are of the sort usually urged in private tort litigation. See Justice Rehnquist's opinion issuing a stay in *Rivera.* —— U.S. ——, 106 S.Ct. 5, 87 L.Ed.2d 683 (1985).

None of the Court's cases bars the use of contingent fees as a benchmark when such fees are the market's method of compensating the sort of legal services in question. Neither do our cases. The Kirchoffs' lawyers contend that we have cleanly rejected the proposition that contingent fees may be the basis for computing awards under § 1988. They cite three cases: *Sanchez v. Schwartz,* 688 F.2d 503, 505 (7th Cir.1982); *Lenard v. Argento,* 699 F.2d 874, 899 (7th Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983); and *Lynch v. City of Milwaukee,* 747 F.2d 423, 429 (7th Cir. 1984). These cases indeed establish limits on the use of contingent fees, but none establishes a bar.

The question in *Sanchez* was whether to adopt the "bright prospects" rule—a doctrine that if a case is likely to involve substantial monetary recovery, so that the prospect of contingent fees will attract counsel, the court should not award fees against the defendants. We rejected the "bright prospects" rule, concluding that although "bright prospects" might attract counsel, the functions of § 1988 include shifting the costs of counsel to those who occasioned the suit, not just ensuring that the plaintiffs could sue. An award of fees enables the plaintiff to keep the whole recovery and brings home to the defendants the full social costs of their unconstitutional conduct, costs that include litigation as well as the original damages. See also Comment, *Attorney's Fees in Damage Actions Under the Civil Rights Attorney's Fee Awards Act of 1976,* 47 U.Chi.L.Rev. 332 (1980) (discussing the legislative history). A rule that assesses contingent fees against defendants is the opposite of the "bright prospects" rule.

*Sanchez* also stated: "We ... decline to hold that where a contingent fee contract has been executed, it serves as an automatic ceiling on the amount of a statutory award." 688 F.2d at 505. Two considerations support this conclusion. First, as we explained in Part II, the contingent fee contract between counsel and the plaintiff in a § 1988 case is not an ordinary contract, because the plaintiff expects the defendant to pay. A court should not use this contract—or the usual percentage in FELA litigation—as the right or maximum percentage. It is necessary to determine the appropriate percentage for legal work of similar risks and probable recoveries. Second, much civil rights litigation is designed to obtain injunctions or precedents. These may be exceptionally valuable but have no ready monetary equivalent. A wooden application of a contingent fee contract assigns these benefits a value of zero. Section 1988 is designed, in part, to compensate counsel for the cost of producing unquantifiable benefits, and when a case yields such results a fee based on a percentage of the monetary recovery will be too low. See also Robert V. Percival & Geoffrey P. Miller, *The Role of Attorney Fee Shifting in Public Interest Litigation,* 47 L. & Contemp.Prob. 233, 237–41 (Win. 1984).

*Lenard* simply recites the holding of *Sanchez:* "The trial court may consider as a factor the contingent fee contract, but it is not to be an automatic limitation on the attorney fee award." 699 F.2d at 899. *Lynch* is in the same spirit: "[W]here the primary relief sought is injunctive or similarly non-monetary, the amount of a § 1988 fee award is not to be reduced merely because money damages may be low or nominal." 747 F.2d at 429. The proposition does not help counsel in a case such as this, in which the plaintiffs sought only money damages, the damages are not nominal and in which the litigation did not create or alter any principle of law. The Kirchoffs sued to redress some of the oldest torts known, not to challenge accepted wisdom or to explore uncharted seas.

Cases in other circuits give a mixed picture at best. Several courts appear to say that contingent fees are irrelevant, impermissible, or both under § 1988. E.g., *Furtado v. Bishop*, 635 F.2d 915, 919 (1st Cir. 1980); *Bryant v. TRW, Inc.*, 689 F.2d 72, 79–80 (6th Cir.1982) (Fair Credit Reporting Act); *Hamner v. Rios*, 769 F.2d 1404, 1408 (9th Cir.1985); *Cooper v. Singer*, 719 F.2d 1496 (10th Cir.1983) (en banc); *Sears v. Atchison, Topeka & Santa Fe Ry.*, 779 F.2d 1450, 1453–54 (10th Cir.1985). These and other cases generally emphasize the non-monetary gains from § 1983 litigation, and to the extent they do so they are at one with our decisions in *Sanchez, Lenard,* and *Lynch.* To the extent they hold (as *Furtado* may) that contingent fees may not be the starting point of an award even in mundane litigation without substantial third-party effects, they are at odds with other circuits, such as *Easley v. Empire, Inc.*, 757 F.2d 923, 932 (8th Cir.1985); *Pharr v. Housing Authority of the City of Prichard*, 704 F.2d 1216, 1217 (11th Cir. 1983); and *Jones v. Central Soya Co., supra,* 748 F.2d at 593, that give greater sway to contingent fee contracts. There is a conflict among these cases; *Hamner,* for example, explicitly rejects part of the holding in *Pharr,* and *Sears* rejects many other cases. Nothing we can do will bring harmony to them.

■ But there may be more disharmony than there needs to be. The use of contingent fees can coexist with a recognition that courts must compensate counsel who produce non-monetary benefits, and that compensation for such benefits is presumptively based on the number of hours it took to produce the benefits. *Sanchez, Lenard,* and *Lynch* suggest that the lodestar approach is best in cases with substantial injunctive or precedent-creating components. The use of contingent fees is appropriate in cases that enforce old precedents and allow effective compensation as a percentage of the total recovery. Neither approach governs all cases, but there is no necessary conflict. The objective in all cases is the same: to award the plaintiff's counsel the market rate for the services reasonably required to produce the victory. "The market" uses different methods of calculating compensation in different kinds of cases.

To sum up: the district judge was entitled to compute the attorneys' fee in this case as a percentage of the total award. The court was mistaken, however, to lift that percentage out of the contingent fee contract. The 40% was to be a minimum, not a cap. The contract was not bargained between the lawyer and the real parties in interest—the defendants. It also may not provide the percentage that is used in similarly risky tort litigation with moderate stakes. We therefore remand the case to the district court for further consideration of the reasonable attorneys' fee.

REVERSED AND REMANDED.

ESCHBACH, Senior Circuit Judge, dissenting.

I agree with the majority's conclusion that the use of a contingent fee is appropriate in computing a reasonable award of attorney fees under 42 U.S.C. § 1988 "in cases that enforce old precedents and allow effective compensation as a percentage of the total recovery." I, nevertheless, cannot join its opinion. To my mind, the majority fails both to recognize the discretion of the district court in setting an award of fees, and to offer adequate guidance to the district court on remand. Were I Judge Marshall, I would be at a loss to say whether the majority found the actual award of fees in this case excessive, insufficient, or, perhaps, even reasonable. I also would be unable to say at what point I had taken an incorrect turn in setting the award of fees.

I

Section 1988 provides that in federal civil-rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. The *reasonableness* of the fee is the relevant statutory benchmark. *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548,

79 L.Ed.2d 891 (1984); *see also Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In enacting § 1988, Congress expressly approved the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), as guidelines for setting an award of fees, which factors in turn were derived from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2–106. *See* S.Rep. No. 1011, 94th Cong., 2nd Sess. 6, *reprinted in* 1976 U.S. Code Cong. & Ad. News 5908, 5913. The legislative history of § 1988 discloses Congress's intent that "a reasonable attorney's fee" is one that is "adequate to attract competent counsel, but ... [does] not produce windfalls to attorneys." S.Rep. No. 1011 at 6; *see also Blum*, 465 U.S. at 893–94, 104 S.Ct. at 1548.

Section 1988 empowers the district court to exercise discretion in determining whether an award is to be made and, if so, its reasonableness.[1] *Blum*, 465 U.S. at 902 n. 19, 104 S.Ct. at 1550 n. 19; *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941; *see also Lovell v. City of Kankakee*, 783 F.2d 95, 96 (7th Cir.1986); *Linhart v. Glatfelter*, 771 F.2d 1004, 1011 (7th Cir.1985); *Berberena v. Coler*, 753 F.2d 629, 632 (7th Cir.1985); *Muscare v. Quinn*, 614 F.2d 577, 580 (7th Cir.1980). "The amount of the fee, of course, must be determined on the facts of each case." *Hensley*, 461 U.S. at 429, 103 S.Ct. at 1937.[2] The district court's award may be set aside on appeal only for a clear abuse of discretion. *See, e.g., Berberena*, 753 F.2d at 632; *Muscare*, 614 F.2d at 580.

## II

As the majority itself acknowledges, this was a simple false-arrest and battery case. It neither established an important constitutional right, nor sought equitable relief for the vindication of such a right. This was an action seeking damages and no more. Anita Kirchoff recovered a judgment for $25,000.00, from which no appeal was taken.

Anita Kirchoff then petitioned the district court for $50,000.00 in fees and costs. After evaluating the petition in light of the guidelines approved by Congress, Judge Marshall rejected it as unreasonable. He commented extensively on the nature of her claim, and noted, quite correctly, that it was essentially a personal-injury tort action with federal constitutional underpinnings. He determined that Kirchoff had prevailed only partially on the merits, and that neither novel nor complex legal issues were involved. Judge Marshall also found that there was no need for two attorneys to litigate the claim, and questioned the amount of time and labor set forth in the petition.

Judge Marshall then began his computation of a fee award with a determination of the "market rate" for the legal services rendered by Kirchoff's counsel.[3] He observed that "the marketplace for this type of litigation throughout my career at the bar has been the contingent fee contract." He noted also that such fee arrangements are useful in attracting competent counsel for civil rights litigants. Judge Marshall concluded that "[t]he market value of this case from a professional standpoint, in my opinion, is the contingent fee which is avail-

---

**1.** It is true that the district court's discretion is somewhat circumscribed on the issue of *whether* an award of fees should be made at all. When the prevailing party is the plaintiff, it is entitled to an award of attorney's fees almost as a matter of course. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983); *Henry v. Webermeier*, 738 F.2d 188, 192 (7th Cir.1984). The *method* of calculating a fee award, however, rests squarely within the sound discretion of the district court. *Linhart v. Glatfelter*, 771 F.2d 1004, 1011 (7th Cir.1985); *Muscare v. Quinn*, 614 F.2d 577, 580 (7th Cir.1980).

**2.** On page 16 of its opinion, the majority indicates that the appropriate fee percentage should be set "by category of case ... rather than case by case."

**3.** The district judge stated that "[a]s I understand the *Hensley* case and its progeny ... the beginning point in applications for attorney's fees under the Civil Rights Act should be a determination of the market value for the services rendered by the prevailing party's counsel, here the prevailing party, Anita Kirchoff."

able in the market *for personal injury actions of this kind."* Only then did he apply the 40% fee contained in Kirchoff's contingent fee contract to the $25,000.00 recovery to reach the $10,000.00 fee award.

### III

The crux of the majority's disagreement with Judge Marshall's computation of a fee award is that the fee percentage contained in Kirchoff's contract *might* not provide "the percentage that is used in similarly risky tort litigation with moderate stakes."[4] The majority, however, does not so much as hint to Judge Marshall what might constitute "similarly risky tort litigation with moderate stakes."[5] Judge Marshall's conclusion that the market value of the legal services involved was represented fairly by a 40% contingent fee was based upon his considerable number of years experience. In reaching that conclusion, Judge Marshall considered Kirchoff's petition for attorney's fees, the defendants' counter-pro-

4. The majority also faults Judge Marshall for incorrectly interpreting the contingent fee contract by treating the 40% fee provision as a "cap" and not as a minimum. This point is not well taken. The contingent fee contract was just one of many factors considered by Judge Marshall in rejecting the fee-award recommendations of both parties, and setting the award he did. Judge Marshall did not, and quite rightly so, understand § 1988 to incorporate a private "fee-shifting" provision contained in a contract negotiated between the prevailing plaintiff and her counsel.

As a logical matter, the fact that the 40% fee provision was designed as a floor, not a ceiling, has little bearing on the reasonableness of the actual fee award. Once Judge Marshall determined that a 40% fee percentage reflected the reasonable market value of the legal services in question, then the relevance, if any, of the fee-shifting aspect of the contract disappeared.

5. On page 13 of its opinion, the majority observes that "the private market uses the contingent fee for personal injury cases, including torts such as battery, false arrest, and malicious prosecution, the subjects of this case." The majority is, of course, well aware that Judge Marshall considered this "a personal injury false arrest case." Judge Marshall then concluded that a 40% fee accurately reflected the market rate of legal services in such a case. The majority, nonetheless, considers Judge Marshall's findings in this regard insufficient, and his choice of a 40% fee inappropriate. I assume the

posal, and supporting affidavits. It is simply inaccurate to suggest that Judge Marshall thought himself wedded to the fee provision in Kirchoff's contingent fee contract. Under such circumstances, and considering the facts of this case, I conclude that Judge Marshall's finding that a 40% fee provision is reasonable in this type of case is sufficient for the purposes of § 1988.[6]

Although the majority does not explicitly state why they fault Judge Marshall's appraisal of the market value of the legal services involved in this case, it does note that Judge Marshall set the fee award from the bench without a separate hearing. Nevertheless, the Supreme Court has made clear that a petition for attorney's fees should not precipitate a second major litigation.[7] *Blum,* 465 U.S. at 902 n. 19, 104 S.Ct. at 1550 n. 19; *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. As the Court has emphasized:

majority's dissatisfaction stems from its discussion on pages 7–8 of its opinion in which it points out a number of differences between ordinary tort litigation and a personal injury claim brought under § 1983, and cautions against uncritically accepting the customary fee percentages in ordinary tort litigation as benchmarks for § 1983 claims. As I read the majority's opinion, then, the customary fee in traditional false-arrest, battery, and malicious prosecution cases must be adjusted to reflect these differences in the context of § 1983. The majority does not, however, provide Judge Marshall with guidance as to how to make appropriate adjustments.

6. Of course, I do not wish to be understood as advocating that a district judge should be restricted to the fee percentage contained in a particular contingent fee contract. As always, the computation of a reasonable fee depends upon the facts of a case, and rests in the first instance within the sound discretion of the district judge.

7. The majority itself praises the use of contingent fees for the very reason that, as compared to the "lodestar" approach, such a practice would reduce the motivation of defendants to litigate a fee award. Yet, the majority's dissatisfaction with Judge Marshall's method of computing the fee award cuts back to a large degree on the advantages of the contingent fee in this regard.

[T]he district court has discretion in determining the amount of a fee award. This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters. It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award.

*Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941.

To my mind, Judge Marshall carefully heeded the Supreme Court's mandate with respect to both the computation of a reasonable fee and as to the conservation of scarce judicial resources. To the extent that my brethern now suggest that Judge Marshall either make more detailed findings or conduct an evidentiary hearing, they compel him to engage in a ritual that exalts form over substance. Section 1988 requires Judge Marshall to set a "reasonable" fee award. It is evident from his remarks that Judge Marshall was well aware of the relevant considerations.[8] This is not to suggest that some civil-rights cases, involving more complex legal issues or more directly implicating the public interest, might not require more detailed findings. Yet, a decision as to what factors, computations, and evidentiary procedures might then be required should await the presentation of those issues in the facts of another case. In any event, to require more in the instant case invites procedures whose practical effects are far worse than the ill these procedures are ostensibly designed to remedy. The majority inexplicably encourages losing defendants to appeal from awards of attorney's fees, even when such appeals are not likely to affect the amount of the final fee award. Not only is such litigation unproductive, but it is inimical to the objectives of § 1988.

For the reasons stated above, I would affirm the district court's judgment.

---

**8.** I could understand the majority's misgivings if there had been no contingent fee contract in this case, and Judge Marshall simply had devined what an appropriate fee percentage would have been had the parties entered into a fee contract. Yet, that is not the case before us. Judge Marshall relied upon the actual agreement between Kirchoff and her attorney as an appropriate starting point for computing a fee award. If her counsel felt that the nature of the litigation warranted a higher fee, he could have drafted the fee contract to reflect that. I thus do not believe Judge Marshall abused his discretion by finding that a 40% fee provision reflected a reasonable market rate for this type of litigation.