# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-2407

STEVEN J. THOROGOOD, individually
    and on behalf of all others
    similarly situated,

*Plaintiff-Appellee*,

*v.*

SEARS, ROEBUCK AND COMPANY,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 1999—**Harry D. Leinenweber**, *Judge*.

SUBMITTED OCTOBER 12, 2010—DECIDED NOVEMBER 2, 2010

Before POSNER, KANNE, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*. In this third appeal arising out of a near-frivolous class action suit by Steven Thorogood, Sears Roebuck, the defendant, asks us to reverse the district court, which has denied Sears's motion to enjoin a virtually identical class action suit—a suit filed in the name of Martin Murray by counsel who represented

Thorogood, and pending in a federal district court in California. *Murray v. Sears, Roebuck & Co.*, No. 4:09-cv-5744-CW (N.D. Cal.). Judge Leinenweber, who had presided over Thorogood's suit and to whom Sears's motion for an injunction was referred, ruled that Sears could obtain adequate relief against being harassed by repetitive litigation by pleading collateral estoppel in Murray's suit. Sears appeals.

Class counsel challenge the jurisdiction of the district court over Sears's motion and our jurisdiction over Sears's appeal. Thorogood's suit was resolved by the entry of a final judgment in favor of Sears without reservation of jurisdiction, and so was no longer pending when Sears asked the district court to enjoin the California suit. But Sears's motion had been filed under the "All Writs Act," which authorizes a federal court to issue "all writs necessary or appropriate in aid of [its] jurisdiction[ ] and agreeable to the usages and principles of law," 28 U.S.C. § 1651(a), and which has been interpreted to empower a federal court "to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977). This power "extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *Id.* at 174 (citations omitted). For the

application of these principles in class action suits, see, e.g., *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation*, 333 F.3d 763, 768 (7th Cir. 2003); *In re VMS Securities Litigation*, 103 F.3d 1317, 1323-24 (7th Cir. 1996); *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1200-01 and n. 4 (7th Cir. 1996).

A person seeking such an order applies to the court that issued the judgment. No other basis of jurisdiction need be shown. *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation, supra*, 333 F.3d at 768; *Bryan v. BellSouth Communications, Inc.*, 492 F.3d 231, 236 (4th Cir. 2007); *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004). So class counsel's jurisdictional challenge fails.

The district court at our direction had decertified Thorogood's class, 547 F.3d 742 (7th Cir. 2008), and Sears argues that by filing a nearly identical suit Thorogood's lawyer has defied that judgment. Consistent with the principles set forth above, "the All Writs Act empowers a federal court to enjoin parties before it from attempting to relitigate decided issues and to prevent collateral attack of its judgments." *In re March*, 988 F.2d 498, 500 (4th Cir. 1993); see also *TBG, Inc. v. Bendis*, 36 F.3d 916, 925-27 (10th Cir. 1994); *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1524 (9th Cir. 1983). Thus the only question is whether the district judge abused his discretion in ruling that a plea of collateral estoppel in the California litigation would give Sears adequate relief from the consequences of the refusal of Thorogood's lawyer—who found someone (Murray) willing to be the

nominal plaintiff in a copycat suit in California—to accept defeat.

We remind the reader of the quixotic nature of the quest on which Clinton Krislov, the plaintiff's lawyer in Thorogood's case (including the current appeal), as well as in the California litigation (though he has co-counsel there, as we'll have occasion to note), has embarked. Thorogood, a Tennessean, bought a Kenmore-brand clothes dryer from Sears (Kenmore is a Sears brand name). The words "stainless steel" were imprinted on the dryer, and point-of-sale advertising explained that this meant that the drum in which the clothes are dried was made of stainless steel. Thorogood claimed to have thought that this meant that the drum was made *entirely* of stainless steel, whereas part of the front of the drum—a part the user would see only if he craned his head inside the drum—is made of a ceramic-coated "mild" steel, which is not stainless steel because it doesn't contain chromium. Thorogood alleged that the "mild" steel in the drum rusted, and stained his clothes.

Lawyer Krislov filed a class action suit on behalf of Thorogood and a half million other purchasers, scattered across 28 states plus the District of Columbia, of Kenmore dryers that had been advertised as having stainless steel drums. The suit claimed that the sale of a dryer so advertised is deceptive unless the drum is made entirely of stainless steel because otherwise it might rust and by doing so stain the clothes in the dryer. Thorogood's individual claim was based on Tennessee's consumer protection statute but the suit alleged that the unnamed

class members had identical claims under similarly worded state consumer protection statutes in their own states, including California.

The suit was originally filed in a state court but was removed to federal district court under the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), 1453, 1711-1715. Judge Leinenweber certified the class. We accepted Sears's appeal from the order of class certification, Fed. R. Civ. P. 23(f), and reversed, ordering the class decertified. We called the case "a notably weak candidate for class treatment." Not only did common issues of law or fact not predominate over the issues particular to each purchaser of a stainless steel Kenmore dryer, as Rule 23(b)(3) requires; there were, we said, "*no* common issues of law or fact." 547 F.3d at 746-47 (emphasis in original).

It was well-nigh inconceivable that the other members of the class had the same understanding of Sears's advertising as Thorogood claimed to have. Sears hadn't advertised the dryers as preventing rust stains on clothes; and it's not as if such stains are a common concern of owners of dryers—there was no suggestion of that either. Stainless steel appliances are popular even among consumers, undoubtedly the vast majority, who do not expect a dryer to cause rust stains. Stainless steel does not rust, and that is certainly a plus, clothing stains to one side. But ceramic doesn't rust either. Many people prefer a stainless steel appliance because it is highly durable, does not stain (we are referring here to stains on the machine, rather than on the clothes being

dried in it), and, when polished, looks better (some people think) than ceramic—but not because they think that a dryer drum that contains a bit of "mild" steel, which anyway is coated with ceramic, would cause rust stains on their clothes. Consumers whose preference for stainless steel is unrelated to an anxiety (probably unreasoning) about rust stains would not be upset to discover that a small, inconspicuous portion of the drum was made of a different kind of steel that anyway was coated with ceramic and hence was rust proof.

Advertisements for clothes dryers mention a host of features that might matter to consumers, such as price, size, electrical usage, appearance, speed, and controls, but not the prevention of clothing stains attributable to rust. The litigation of the class members' claims would thus have devolved into a series of individual hearings in which each class member who wanted to pursue relief against Sears would testify to what he understood to be the meaning of a label or an advertisement that identified a clothes dryer as containing a stainless steel drum. Few if any of them, we imagine, would share Thorogood's concerns, which, judging from the record in his case and the argument of his lawyer, are a confabulation. But the important point is that there would be no economies of class action treatment because there would be no issues that could be resolved in a single, class-wide evidentiary hearing.

An additional consideration in deciding whether to allow the claims in a suit to be litigated as a class action is relief. Thorogood was seeking on behalf of himself

and the members of the class actual damages rather than statutory damages; the latter might not require individual proof, but calculation of actual damages would. And even if there were other consumers who like Thorogood were prepared to testify that they wouldn't pay a premium for a dryer that contained a drum that was not 100 percent stainless steel, the amount of damages would vary from consumer to consumer. A few might (though we were and are dubious) have experienced rust stains, or be fearful of experiencing them, and therefore seek as damages either the cost of removing the stains, or the difference between the resale value of their stainless steel dryer and what a new dryer would cost, or both. Others may have bought a Kenmore at a discount and as a result ended up paying no more than they would have paid for a machine with a porcelain drum. And some—since the Kenmore's stainless steel drum is packaged with other premium features rather than offered as a separately priced option—may have incurred no damages at all, because they prefer their stainless steel dryer to any other dryer they could buy even if the stainless steel feature itself was a neutral or even negative consideration in their purchasing decision.

The difficulty of determining the relief to which individual class members in Thorogood's suit who could prove that they had been deceived by Sears's representations might be entitled, though serious, was not the deal breaker, because "aggregate class proof of monetary relief may . . . be based on sampling techniques or other reasonable estimates, under accepted rules of evidence."

3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10.3, p. 480 (4th ed. 2002). The deal breaker was the absence of any reason to believe there was a single understanding of the significance of advertising clothes dryers as containing a stainless steel drum, and so a predominating issue that was common to all class members.

After we ordered the class decertified, thus shrinking the suit to Thorogood's individual claim, and with the parties in agreement that the maximum damages that he could recover under Tennessee law were $3,000, Sears made Thorogood an offer of judgment under Rule 68 of the civil rules of $20,000 inclusive of attorneys' fees. The district judge, believing that Thorogood should receive no attorneys' fees, dismissed the suit because the defendant's offer exceeded the amount in controversy ($3,000, without attorneys' fees), and so the case was moot. Thorogood appealed. He had, he claimed, incurred attorneys' fees of $246,000, and even though they exceeded the value of the relief he had received by a factor of 82, he claimed that the fees had been a worthwhile investment that Sears should be ordered to reimburse him for. Because Sears had offered him in settlement an amount equal to the maximum damages (and more) that he could have obtained for his individual claim, he argued that his theory of liability had been vindicated, entitling him to a judgment on which he hoped to build a claim for attorneys' fees and, as we'll see, obtain a litigation advantage in other states.

The argument for attorneys' fees was beyond weak. The relief that Thorogood had received was not ordered by a

court and could by no stretch of the imagination be thought a vindication of a threadbare, idiosyncratic claim worth at most $3,000. The $246,000 in attorneys' fees that class counsel sought reimbursement for had been incurred in a doomed effort to maintain the suit as a class action; no one incurs such fees to prosecute a claim worth at most $3,000. Sears was paying to rid itself of a nuisance. The effort to escalate Thorogood's dubious claim into a sprawling nationwide class action had been a flop. Not believing that Sears should have to bear the entire cost of the flop, we affirmed the district court's denial of attorneys' fees and dismissal of the suit. 595 F.3d 759 (7th Cir. 2010).

Thorogood's counsel had told the district court that he wanted a judgment in his client's individual case, for however little money, not only as a premise for an award of attorneys' fees but also so that he could use it as "offensive" res judicata in other cases (that is, to preclude Sears's defending similar cases on the merits); for he was already planning to circumvent our order decertifying the class by bringing class actions elsewhere. The California suit here sought to be enjoined was thus foreordained, and unless enjoined will be the precursor to other class actions materially identical to Thorogood's. For lawyer Krislov is nothing if not determined, indeed pugnacious.

He argues that Murray's case is "different" from Thorogood's. Yet Murray was a member of Thorogood's class; and Krislov (who as we noted is also Murray's counsel) had represented to us in Thorogood's case that

the laws of all 29 jurisdictions in which members of the class resided were so similar, as far as the claims in his class action suit were concerned, that "all litigants [including all class members] are governed by the same legal rules"—"plaintiff will need to prove the *same standards* for every jurisdiction" (emphasis in original)—"all the class members here are covered by the same legal rule"—"plaintiff has essentially created a subclass of all jurisdictions with the same substantive consumer fraud statute."

Now singing a different tune, Krislov contends that California's consumer fraud law is different from that of the other 28 jurisdictions. We'll see that the contention is irrelevant to the applicability of collateral estoppel. He also contends that the California state courts are reluctant to apply collateral estoppel to judgments in consumer protection cases. That, if true, is also irrelevant, because the preclusive effect of a federal judgment, in this case the judgment of the district court in Illinois decertifying Thorogood's class, is determined by federal law. *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508-09 (2001); *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation*, *supra*, 333 F.3d at 767-68; *In re Baycol Products Litigation*, 593 F.3d 716, 721 (8th Cir. 2010), cert. granted under the name *Smith v. Bayer Corp.*, No. 09-1205, 2010 WL 1526440 (Sept. 28, 2010). Often, as these opinions note, the federal court will "borrow" the local state's doctrine of collateral estoppel to serve as the federal rule of decision. But a court in Illinois would not borrow the California doctrine when the named plaintiff in the suit

in which the federal judgment was issued was a Tennessean suing under Tennessee law.

The class in Murray's case is of course smaller than Thorogood's because it is limited to California purchasers, but it is still very large. The claims in Murray's case, when Sears pleaded the defense of collateral estoppel, were identical to Thorogood's; they challenged the same advertising for the same models of clothes dryer. Murray acknowledged that he was alleging "a similar general set of operative facts as alleged in the *Thorogood* case." And although normally "'one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process,' *Hansberry v. Lee,* 311 U.S. 32, 40 (1940) . . . [,] in a class action, for example, a person not named as a party may be bound by a judgment on the merits of the action, if she was adequately represented by a party who actively participated in the litigation. See *id.,* at 41 . . . . Representative suits with preclusive effect on nonparties [thus] include properly conducted class actions." *Taylor v. Sturgell,* 553 U.S. 880, 884, 894-95 (2008).

And so the district court in California ruled that Murray was collaterally estopped to bring his suit as a class action. But Murray then amended his complaint to allege additional facts in an effort to show that he had a different case, perhaps one more amenable to class action treatment. On the basis of the amendment the district judge in California reversed his earlier ruling, and having thus rejected the defense of collateral estoppel allowed discovery to begin. Murray then issued bulky

discovery requests. The district judge, as far as we know, will not rule on whether the suit can be maintained as a class action suit because common issues predominate over individual class members' issues, until discovery is complete.

Ordinarily the ability to plead res judicata or collateral estoppel gives a litigant adequate protection against being harassed by repetitive litigation by the loser in a previous suit against him. And when the remedy at law (as by pleading a defense to a damages action) for harmful conduct is adequate, there is no basis for an injunction, including injunctive relief under the All Writs Act. But this case is unusual both because it involves class action litigation and because of the specific tactics employed by class counsel, which include, as we'll see, something close to settlement extortion.

The class action is a worthwhile device for economizing on the expense of litigation and enabling small claims, illustrated by Thorogood's claim, capped at $3,000, to be litigated at all (though when the claim is deceptive advertising, a proceeding before the Federal Trade Commission is a more economical alternative to a class action suit). But the device also lends itself to abuse. As Judge Friendly pointed out many years ago, class members are interested in relief for the class but the lawyers are primarily interested in their fees, and the class members' stakes in the litigation are ordinarily (and in the present case or cases) too small to motivate them to supervise the lawyers in an effort to align the lawyers' incentives with their own. *Saylor v. Lindsley*, 456

F.2d 896, 900-01 (2d Cir. 1972). Defendants, wanting to minimize the sum of the damages they pay the class and the fees they pay the class counsel, are willing to trade small damages for high attorneys' fees, especially since, as Judge Friendly put it in another case, "a juicy bird in the hand is worth more than the vision of a much larger one in the bush, attainable only after years of effort not currently compensated and possibly a mirage." *Alleghany Corp. v. Kirby*, 333 F.2d 327, 347 (2d Cir. 1964) (dissenting opinion). These convergent incentives forge a community of interest between class counsel, who control the plaintiff's side of the case, and the defendants, but may leave the class members out in the cold.

The judge who presides over a class action and must approve any settlement is charged with responsibility for preventing the class lawyers from selling out the class, but it is a responsibility difficult to discharge when the judge confronts a phalanx of colluding counsel. "The defendant wants to minimize outflow of expenditures and the class counsel wants to increase inflow of attorneys' fees. Both can achieve their goals if they collude to sacrifice the interests of the class." Christopher R. Leslie, "The Significance of Silence: Collective Action Problems and Class Action Settlements," 59 *Fla. L. Rev.* 71, 79-81 (2007) (footnote omitted); see also (besides references in our original opinion) John C. Coffee, Jr., "Litigation Governance: Taking Accountability Seriously," 110 *Colum. L. Rev.* 288, 326-27 (2010).

Another problem with the class action is the enhanced risk of costly error, which creates a pressure for settle-

ment that may be disproportionate to the actual merits of the suit. Suppose a company is sued a number of times for selling a defective product. It wins some of the cases and loses others, so that the aggregate outcome reflects more or less accurately the expected litigation value of the plaintiffs' claims. (This assumes no offensive res judicata, which would give preclusive effect to the plaintiff's first win. See *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1299-1300 (7th Cir. 1995).) But when the central issue in a case is given class treatment and so will be resolved once and for all, a trial becomes a roll of the dice. Depending on the size of the class, a single throw may determine the outcome of an immense number of separate claims (hundreds of thousands, in the dryer litigation)—there is no averaging of decisions over a number of triers of fact having different abilities, priors, and biases. The risk of error becomes asymmetric when the number of claims aggregated in the class action is so great that an adverse verdict would push the defendant into bankruptcy; in such a case the defendant will be under great pressure to settle even if the merits of the case are slight. *Id*. at 1298-99. A small probability of a large dollar loss can be a large dollar figure.

A variant of this problem arises when class counsel can, as they are attempting to do in their scorched-earth campaign against Sears, increase the number of throws of the litigation dice. If for example class counsel have a 10 percent chance of winning a given state-wide class action against a given defendant, and they sue that defendant 50 times (one suit per state), they are pretty certain to win quite a number of their cases,

although the aggregate damages will be smaller than if they won a single nationwide class action. Even if class counsel filed only 12 cases, the probability that the defendant would win them all would be only 28 percent ($.9^{12}$ = .28). And that probability (the probability of the defendant's winning all the cases) would fall to one-half of one percent ($.9^{50}$ = .005) if class counsel sued in all 50 states. And this despite the fact that the defendant in our example has a 90 percent chance of winning any one of the 50 cases.

An additional asymmetry, also adverse to defendants, involves the cost of pretrial discovery in class actions. One purpose of discovery—improper and rarely acknowledged but pervasive—is: "it makes one's opponent spend money." Brian Anderson & Andrew Trask, *The Class Action Playbook* § 4.5, pp. 115-16 (2010); see Joint Project of the American College of Trial Lawyers Task Force on Discovery and the Institute for the Advancement of the American Legal System, "Interim Report," p. 1 (Aug. 1, 2008), www.actl.com/AM/Template.cfm?Section=Home&template=/CM/ContentDisplay.cfm&ContentID=3650 (visited Oct. 15, 2010). In most class action suits, including this one, there is far more evidence that plaintiffs may be able to discover in defendants' records (including emails, the vast and ever-expanding volume of which has made the cost of discovery soar) than vice versa. For usually the defendants' conduct is the focus of the litigation and it is in their records, generally much more extensive than the plaintiffs' (especially when as in a consumer class action the plaintiffs are individuals rather than corporations or other institutions), that

the plaintiffs will want to rummage in quest for smoking guns.

The merit of Murray's case, like Thorogood's, of which it is a close copy, is slight. But the pressure on Sears to settle on terms advantageous to its opponent will mount up if class counsel's ambitious program of discovery is allowed to continue. A letter from Mark Boling, Murray's co-counsel, to Sears's counsel, printed at the end of this opinion, illustrates the point. The letter reminds Sears that discovery is proceeding and "will involve Plaintiff's counsel delving into the full extent of Defendants' alleged wrongdoing" in order to justify not only equitable relief but also punitive damages—which are potentially very large given the size of the class and the possible preclusive use of any judgments favorable to the plaintiffs in suits brought in other states. The letter continues: "as we progress through the various stages of this litigation, the cost of settlement will necessarily increase . . . . At this point, we may want to consider whether an appropriate olive branch for resolution can be mutually created on a class wide basis commensurate with the status of the case. If interested, please pick up the telephone and call me. In the meantime, Plaintiff will continue to diligently and timely prosecute this case to an appropriate result." In other words, unless Sears settles now (implicitly for modest relief for the class and an agreement with class counsel to recommend to the judge generous fees for Krislov and Boling), it will incur the considerable cost of responding to class counsel's distended project of "delving" and assume the risk of a very large adverse judgment. And as Boling's letter also

points out, "if plaintiff is successful on a motion for class certification, the court as the gate keeper will demand a more significant recovery for resolution."

The threat to turn the screws on Sears is all the more credible because Murray's suit is a duplicate of Thorogood's, with just enough differences to confuse the district judge in California about Sears's defense of collateral estoppel. If the refusal to enjoin Murray's suit sticks, there is nothing standing in the way of Krislov's filing carbon-copy class actions against Sears in other states as well.

In refusing to enjoin Murray's suit, Judge Leinenweber mentioned none of these considerations. He seems to have believed that pleading res judicata or collateral estoppel *always* provides adequate relief against vexatious litigation. This case shows that it does not, as do the similar cases we cited earlier and the cases that say that enjoining vexatious litigation is preferable to "the harassment of an expensive, time-consuming procedure to prove [a defendant's] res judicata or estoppel claims in another court." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 552 F.2d 601, 603 (5th Cir. 1977); see also *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 123-24 (2d Cir. 2007); *In re Hartford Textile Corp.*, 681 F.2d 895, 897 (2d Cir. 1982); *Blanchard v. Commonwealth Oil Co.*, 294 F.2d 834, 841 (5th Cir. 1961).

The district judge in California, by rescinding his acceptance of Sears's defense of collateral estoppel and allowing discovery to proceed, has visited on Sears the

consequences that the injunction that Sears sought from the district court in Illinois would have prevented. Murray's case was removed to federal district court in California in December 2009 and as of early October of this year had already accrued 126 docket entries. There is no way in which Sears can recoup the expense of responding to Murray's extravagant discovery requests and of filing preclusion defenses against duplicative class actions in other states. The harm it faces from the denial of the injunction is irreparable and its remedy at law against settlement extortion nonexistent.

Of course we must pay respectful attention to the ruling by the district judge in California. But we cannot brush aside Sears's challenge to its correctness by telling Sears to appeal to the Ninth Circuit. It can't, at least in time to avert irreparable harm, because the judge's order rejecting the defense of collateral estoppel and thus letting discovery proceed is an unappealable inter-locutory order. Sears's action under the All Writs Act is its only means, other than submitting to lawyer Boling's demands, of avoiding being drowned in the discovery bog.

The district judge in California said that Murray had "sufficiently amended his complaint so as to differentiate it from the complaint in *Thorogood* to avoid the applica-tion of collateral estoppel." Murray had done this, the judge continued, by "includ[ing] allegations that [Sears had] expressly advertised the significance of the fact that [the] dryers contain stainless steel drums," for example by advertising that "Durable Drum *eliminates rusting and chipping* for long lasting performance" and "KEEP YOU

[*sic*] CLOTHES LOOKING GREAT: an exclusive, *all stainless steel drum* provides lasting durability" (emphasis in original). The judge said: "These allegations are of the precise type that the Seventh Circuit said would distinguish *Thorogood* from a claim in which common issues might predominate."

The judge has misunderstood both the ads and our opinion. It's true that stainless steel does not rust or chip, and therefore a dryer that is made, even if only in part (the drum), of stainless steel should indeed provide "lasting durability." But the claim is not falsified if a small part of the drum is made of "mild" steel coated with ceramic. And a dryer's durability has nothing to do with rust stains in clothing, Thorogood's contention and Murray's as well. The only reference to stains in the advertising of the dryer is the claim, mysteriously quoted in Murray's 129-paragraph amended complaint, that "stainless steel also resists staining *from* clothes" (emphasis added), that is, the staining of the dryer itself.

Our original opinion discussed a representation by Sears in marketing the dryer that is materially identical to the one that the district judge in California quoted from Murray's amended complaint to show that Murray's suit is critically different from Thorogood's—"Stainless Steel Drum resists rust and won't chip, peel or snag clothes." 547 F.3d at 747. There is nothing new in Murray's complaint that would allow an escape from the bar of collateral estoppel. The critical issue was and is what consumers would understand by representations that the Kenmore dryer has a stainless steel drum. Would they think it

meant that the drum was 100 percent stainless steel? Would they not have bought it had they thought it was only 99 percent stainless steel? These questions can't be answered on a class-wide basis, and so there would be no economies from allowing the suit to proceed as a class action.

The question is not whether Murray has a stronger case than Thorogood had. What collateral estoppel does is forbid the reexamination, in a subsequent suit, of a finding essential to a previous decision. *Montana v. United States*, 440 U.S. 147, 153-54 (1979); *Chicago Truck Drivers, Helpers & Warehouse Union (Independent) Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526, 530 (7th Cir. 1997). The finding is that common issues did not predominate in Thorogood's suit. Well, neither do they in Murray's; the differences between the suits do not bear on that finding. The judge in California thus was wrong; Murray's suit is barred by collateral estoppel. But because of the cost of responding to discovery, and the erroneous but unappealable ruling permitting discovery in Murray's suit, Sears has no adequate remedy at law against a litigation aimed at coercing a settlement by running up Sears's discovery expense.

Abuse of litigation is a conventional ground for the issuance of an injunction under the All Writs Act, e.g., *In re Martin-Trigona*, 737 F.2d 1254, 1262 (2d Cir. 1984), because without an injunction a defendant might have to plead the defense of res judicata or collateral estoppel in a myriad of jurisdictions in order to ward off a judgment, and would be helpless against settlement extor-

tion if a valid such defense were mistakenly rejected by a trial court.

So Sears is entitled to an injunction. But we must be careful about precisely who and what are to be enjoined. Sears wants to enjoin all members of the class that was decertified pursuant to our decision in Thorogood's case, plus their lawyers. The lawyers should indeed be included in the injunction, as has been done in other cases. See *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation*, *supra*, 333 F.3d at 769; *Newby v. Enron Corp.*, 302 F.3d 295, 300-03 (5th Cir. 2002) (the "district court had authority under the All Writs Act to enjoin [the law firm] from filing future state court actions without its permission and did not abuse its discretion in doing so"); *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation*, 271 F. Supp. 2d 1080 (S.D. Ind. 2003), on remand from 333 F.3d 763 (7th Cir. 2003) ("'all members of the putative national classes . . . , *and their lawyers*,' are hereby prohibited 'from again attempting to have nationwide classes certified over defendants' opposition with respect to the same claims'") (emphasis added) (the interior quotation is from this court's opinion in *In re Bridgestone/Firestone*); cf. *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 589 F.3d 835, 837 (6th Cir. 2009). If Krislov and the other class counsel are not enjoined, they will continue their state-by-state quest for certification and will doubtless be able to find at least one lead plaintiff in every state.

Nevertheless Sears's proposed injunction suffers from defects both of under- and of overinclusion. On the one hand, an injunction against class action suits "based on the

same allegations" as Thorogood's suit would not bar even Murray's suit, since he's added allegations, though his claim is materially the same. On the other hand, (1) Thorogood's class consisted of hundreds of thousands of persons scattered across the country, and there is no feasible means of notifying them of the injunction; (2) no one can be enjoined from filing an individual suit, as distinct from a class action suit, on the basis of a finding relating only to class certification; and (3) there is an additional defendant in Murray's suit—Electrolux Home Products, Inc., the manufacturer of the Kenmore dryer—and it is not a party to the proceeding under the All Writs Act or to this appeal and is therefore entitled to no relief. All these qualifications must be reflected in the injunction.

The members of Thorogood's class must be enjoined as well as the lawyers so that additional Murrays don't start popping up, class action complaint in hand, all over the country, represented by other members of the class action bar. It is true as we recall that an unnamed class member can be bound by the judgment in a class action suit only "if she was adequately represented by a party who actively participated in the litigation." *Taylor v. Sturgell*, *supra*, 553 U.S. at 884. But Thorogood did participate actively in seeking class certification, and his representation by lawyer Krislov was adequate (it was energetic and pertinacious to a fault).

We ordered the class decertified because of the absence of issues common to all the class members. That ruling—as the injunction must make clear—does not preclude any

of the class members from filing individual suits. For it was not a ruling on the merits of any class member's claim (including Thorogood's). All that's precluded is the filing (by members of Thorogood's class, which includes the members of Murray's class, or by the lawyers for those classes) of class action suits that are indistinguishable, so far as lack of commonality among class members' claims is concerned, from Thorogood's. See *Hansberry v. Lee*, *supra*, 311 U.S. at 40-42; *Tice v. American Airlines, Inc.*, 162 F.3d 966, 971 (7th Cir. 1998); *In re Prudential Ins. Co. of America Sales Practice Litigation*, 261 F.3d 355, 366 (3d Cir. 2001).

The injunction should state that no unnamed class member can be punished for contempt until and unless a copy of the injunction is served on him; should cover all class action suits challenging representations, in Sears' existing advertising, labeling, and other marketing that the stainless steel drums in Kenmore dryers are made of stainless steel; and should not forbid class action suits challenging representations materially different from those in Thorogood's and Murray's cases, or representation concerning a dryer that contains a different amount of stainless steel.

There is a final wrinkle to be considered. Naturally Sears wants to enjoin further class action suits concerning the dryers regardless of whether they are filed in state court and not removed to federal court, or filed in state court and removed to federal court as in the present case, or filed originally in federal court. But a federal court's injunction against a suit in state court

must comply with the limitations imposed by the Anti-Injunction Act, 28 U.S.C. § 2283, and in *Smith v. Bayer Corp.*, *supra*, the Supreme Court has granted certiorari to decide two issues of interpretation (summarized by SCOTUSblog, "Smith v. Bayer Corp.," www.scotusblog.com/case-files/cases/smith-v-bayer-corp (visited Oct. 18, 2010)) that could affect the scope of an injunction in the present case:

> 1. Whether . . . a district court can enjoin parties from seeking class certification in state court under state procedural rules when the district court had previously denied certification of a similar class under federal procedural rules but neither the parties sought to be estopped nor the issues to be presented in state court are identical as those presented to the district court. 2. Whether a district court that previously denied class certification nonetheless has personal jurisdiction over the absent putative class members such that it may enjoin them from seeking class certification in state court.

The judge should nevertheless make the injunction applicable to further copycat suits in state as well as in federal courts. But he should make clear that persons subject to it will be allowed to obtain modification in light of the Supreme Court's decision in the *Smith* case, when it is rendered.

We do not think it likely that the Court will go so far as to hold that injunctive relief against class-action harassment is inappropriate under the All Writs Act even when

the actions sought to be enjoined are actions in federal rather than state court, on the theory that before certification class members cannot be thought to have been adequately represented. That would be inconsistent with the Court's opinion in *Taylor* and the cases cited in it. And quite apart from the green light that such a ruling would give to extortionate class action practice, a denial of relief would make no sense in a case like this, in which the class (Thorogood's) *was* certified, albeit later decertified at our direction. Class counsel had and took the opportunity to litigate the certification issue fully—so that to say that a ruling against certification could not be the basis of an injunction would be inconsistent with the doctrine of collateral estoppel itself. There is no denying that a final ruling against certification has collateral estoppel effect. And the basis of the injunction sought in this case is simply the need for enforcing collateral estoppel more effectively than by forcing the defendant to plead it as a defense in case after case.

We leave the details of the injunction to be worked out by the district judge, but commend for his consideration similar injunctions entered in *In re Bridgestone/ Firestone, Inc., Tires Products Liability Litigation* (by the district court on remand); *In re Prudential Ins. Co. of America Sales Practice Litigation, supra*, 261 F.3d at 360-61, and *Wood v. Santa Barbara Chamber of Commerce, Inc., supra*, 705 F.2d at 1523 n. 6.

REVERSED AND REMANDED.

**APPENDIX—THE BOLING LETTER**

From: Mark Boling

Sent:  Monday, September 06, 2010 7:26 PM

To:  Dosker, Mark C.; Mark S. Mester; Oliss, Philip M.

Subject: Murray: OPC—Settlement Communication

Dear Counsel,

Your law firms have represented Defendants honorably, but unsuccessfully, on the issue of collateral estoppel in this case. At every significant stage of a lawsuit, a business decision must be made by the parties to extend and accept an olive branch for resolution of the case or continue to litigate. We are at one of those stages.

Judge Wilken has decided in Dkt No. 120 ("Order") that the Murray case will go forward with class claims. In so doing, this district court has also preliminarily determined that the toughest requirement for class certification, i.e. common issues of fact and law, exists in this case as compared with the *Thorogood* case.

> "Plaintiff has sufficiently amended his complaint so as to differentiate it from the complaint in Thorogood to avoid the application of collateral estoppel. Unlike the complaint in Thorogood, the amended complaint includes allegations that Defendants expressly advertised the significance of the fact that their dryers contain stainless steel drums. For instance, Sears' website describes the "Stainless Steel Drum" as "Durable Drum eliminates rusting and chipping for long lasting performance." First Amended Complaint (IAC) ¶50 (emphasis added). Sears' website and in-store brochures state that Kenmore Dryers will "KEEP YOU

> CLOTHES LOOKING GREAT: An exclusive, all stainless steel drum provides lasting durability." Id. ¶52 (upper case in original; emphasis added). These allegations are of the precise type that the Seventh Circuit said would distinguish Thorogood from a claim in which common issues might predominate." (Order, 7:10-25.)

The stay on discovery is lifted and Plaintiff may commence discovery on his class claims. Currently, four discovery matters against defendants are pending with the magistrate judge. As you are aware other discovery disputes are in progress. This next stage of litigation will involve Plaintiff's counsel delving into the full extent of Defendants' alleged wrongdoing to establish not merely a likelihood to mislead, but Defendants' intentional fraudulent acts to justify the court in exercising the full extent of its equitable powers and a jury to award punitive damages against each Defendant.

With respect to the issue of relief, the risk of a substantial recovery is very probable in this case. Under California law, equitable relief is steadily evolving against the wrongdoer under the California Unfair Competition Law (*Cal. Bus. & Prof. Code* Section 17200 et seq.). In fashioning a remedy under the unfair competition law, section 17203 does not mandate restitutionary or injunctive relief, rather it provides that the court "may make such orders or judgments . . . as may be necessary to prevent the use or employment . . . of any practice which constitutes unfair competition . . . or as may be necessary to restore to any person in interest any money or property . . . which may have been acquired by means of such unfair competition." Thus, the court has broad equitable power to create a remedy. *Cortez v. Purolator Airfiltration Products Co.* (2000) 23 Cal.4th 163, 179.

While rescission may be followed by restitution in an appropriate contract action, rescission is not a necessary predicate to

granting restitution in a statutory action under the UCL. (*People ex rel. Kennedy v. Beaumont Investment, Ltd*. (2003) 111 Cal.App.4th 102, 132-33.) *Nelson v. Pearson Ford Co*. (2010) 186 Cal.App.4th 983, 1018. In the recent *Nelson* case, the California appellate court upheld the trial court's decision to award the members of the insurance class all the money they had paid for their vehicles and acquired through Pearson Ford's unfair practices as of the date of the judgment and without having the class members return their vehicles. In the instant case, this means that each of the affected Sears' customers may recover their entire purchase price, delivery and installation costs as of the date of judgment and not have to return the dryer.

Plaintiff Murray's initial disclosures set forth alternative damages calculations ranging from the premium paid for a stainless steel drummed dryer as compared with a non-stainless steel drummed dryer to the full purchase price of the dryer plus consequential damages of delivery and installation costs. The affected Sears customers also have an interest in the profits seeking to be disgorged from both Sears and Electrolux as a restitutionary recovery under the provisions of the CLRA and/or UCL statute based upon what has been improperly received by Defendants through the sales transactions in the stream of commerce involving the subject products. These profits constitute money that once had been in the possession of these Sears customers to whom it is to be restored.

As we progress through the various significant stages of this litigation, the cost of settlement will necessarily increase. If plaintiff is successful on a motion for class certification, the court as the gate keeper will demand a more significant recovery for resolution. Finally at time of trial, Plaintiff will be seeking restitutionary relief of the full amounts of all transactional costs without offset, punitive damages based on Defendants' intentional deception and injunctive relief reen-

forcing the terms of the FTC Order against Sears and extending the terms of the FTC Order against Electrolux.

At our first appearance in court, Judge Wilken was surprised that Defendants have not already conceded that the drum front for the products was not made of stainless steel. There can be no vindication for Defendants in this case, only damage control. At this point, we may want to consider whether an appropriate olive branch for resolution can be mutually created on a class wide basis commensurate with the status of the case. If interested, please pick up the telephone and call me. In the meantime, Plaintiff will continue to diligently and timely prosecute this case to an appropriate result, and expect your timely cooperation.

Thank you in advance for your consideration of this matter. I trust that good business judgment will prevail by all parties.

Sincerely,

Mark B.